**ESTATE OF GARY VAUGHN v. PIKE ELECTRIC, LLC**

[230 N.C. App. 485 (2013)]

THE ESTATE OF GARY VAUGHN, TAMMY VAUGHN, ADMINISTRATRIX, Plaintiff
v.
PIKE ELECTRIC, LLC, PIKE ELECTRIC, INC., and
KENNETH SHALAKO PENLAND, Defendants

No. COA13-448

Filed 19 November 2013

1. **Appeal and Error—interlocutory orders and appeals— denial of motions to dismiss—substantial right—Workers' Compensation Act exclusivity provision**

    The denial of a motion to dismiss under N.C.G.S. § 1A-1, Rule 12(b)(1) and the exclusivity provision of the Workers' Compensation Act in a negligence case affected a substantial right and were immediately appealable. Further, the denial of defendants' N.C.G.S. § 1A-1, Rule 12(b)(6) motions to dismiss were immediately appealable as affecting a substantial right to the extent that they involved the trial court's jurisdiction over this matter.

2. **Workers' Compensation—Woodson employer exception— failure to allege intentional misconduct**

    The trial court's order denying defendant Pike Electric's motions to dismiss under N.C.G.S. § 1A-1, Rules 12(b)(1) and 12(b)(6) in a negligence case was reversed. Plaintiff offered no basis to believe that Pike Electric was aware of, intended, or was substantially certain that defendant Penland's actions on that day would result in decedent's death. Plaintiff failed to allege uncontroverted evidence of defendant Pike Electric's intentional misconduct.

3. **Workers' Compensation—Pleasant co-employee exception— willful, wanton, and reckless negligence**

    The trial court's order denying defendant Penland's motions to dismiss under N.C.G.S. § 1A-1, Rules 12(b)(1) and 12(b)(6) in a negligence case was affirmed. An employee may exhibit willful, wanton, and reckless negligence either when he intentionally injures a coworker or when he does so with manifest disregard to the consequences of his actions. Defendant Penland's alleged direction to send decedent up a utility pole despite decedent's severe lack of training and expertise was sufficient to create an inference that Penland was manifestly indifferent to the consequences of his actions under either Rule 12(b)(1) or Rule 12(b)(6).

Appeal by Defendants from order entered 25 February 2013 by Judge Gary M. Gavenus in Rutherford County Superior Court. Heard in the Court of Appeals 11 September 2013.

*Podgorny Law, P.A., by George Podgorny, Jr., and Price, Smith, Hargett, Petho & Anderson, by Richard L. Anderson, for Plaintiff.*

*Roberts & Stevens, P.A., by F. Lachicotte Zemp, Jr. and Robin A. Seelbach, for Defendants Pike Electric, LLC and Pike Electric, Inc.*

*Bennett & Guthrie, P.L.L.C., by Richard V. Bennett, Roberta King Latham, and Joshua H. Bennett, for Defendant Kineth Shalako Penland.*

STEPHENS, Judge.

*Factual and Procedural Background*

This case arises from the death of Gary Vaughn ("Decedent"). He was electrocuted on 29 October 2009 while working as a groundman for Defendants Pike Electric, LLC and Pike Electric, Inc. (collectively, "Pike Electric") and died as a result of that injury. Almost three years later, on 4 October 2012, Decedent's surviving spouse and the administratrix of his estate, Tammy Vaughn ("Plaintiff"), filed a negligence complaint against Pike Electric and Decedent's supervisor, Defendant Kineth Penland ("Penland"), in Rutherford County Superior Court.[1]

In her complaint, Plaintiff alleges the following:

> 10. . . . Decedent was employed by Pike Electric as a groundman. As a groundman, . . . Decedent assisted foremen, linemen[,] and other employees of Pike Electric who worked on . . . overhead distribution lines . . . .
>
> 11. [Groundmen] . . . were neither trained nor permitted to perform work on poles with energized lines . . . due to the risk of electrocution and/or death inherent in such work.
>
> . . .

---

1. Plaintiff's original complaint was filed on 20 June 2011, less than two years from the date of Decedent's death. Plaintiff filed a voluntary dismissal, without prejudice, four months later and brought suit in this particular case within one year of the date of that dismissal. *See generally* N.C.R. Civ. Pro. 41(a)(1).

13.  On the morning of October 29, 2009, . . . Decedent was employed as a groundman in a crew overseen by Penland [, which had been] instructed to retrofit transformers on overhead power lines . . . .

14.  As a groundman, the duties to be performed by . . . Decedent during this work were prescribed and circumscribed by the Pike Electric [work methods and safety manuals]. These duties did not include working on power lines; especially work on energized power lines.

15.  [At the time of his death, Decedent had been employed as a groundman for less than two months] and had not received any training or job assessment during that period of time. [Defendants] knew that . . . Decedent had received no training to perform the work required of a lineman.

16.  Defendants knew that . . . Decedent had . . . no previous experience with power line distribution and transmission and had worked as a truck driver prior to being employed by . . . Pike Electric.

17.  Defendants knew that . . . Decedent had received no training as a lineman and . . . was not [permitted to] climb[] poles or work[] on or near energized lines or equipment . . . .

18.  Retrofitting transformers is an inherently dangerous activity as it involves de-energizing the transformer by disconnecting the stinger from the primary line, replacing the lightning arrester, installing guy sticks, installing a fused cutout[,] and re-energizing the transformers.

19.  . . . Defendants knew that undertaking such a task required specific training and experience and that instructing a novice groundman such as . . . Decedent to perform such work was certain to result in death or serious injury.

20.  . . . Penland instructed . . . Decedent to climb the utility pole [that] was supporting [the] overhead power lines . . . and to begin the work of retrofitting the transformer.

21.  The power lines that Penland instructed . . . Decedent to work on were high voltage distribution lines. They were energized[,] uninsulated[,] and carried 7200 volts of electricity.

22. Defendants knew that [groundmen] such as Decedent were not qualified, nor permitted, to undertake any of those dangerous activities.

23. Nevertheless, . . . Decedent was . . . instructed to use a "shotgun" stick to de-energize the pole. This involved the dangerous step of removing the hotline clamp from the primary line which would leave the primary line exposed. This is a task reserved for [a] trained and experienced lineman.

24. Defendants knew that . . . Decedent had neither the training nor experience to safely carry out such a task[,] yet instructed him to do so regardless.

25. . . . Decedent was not supervised nor provided with adequate personal protective equipment while undertaking the tasks assigned to him.

26. Shortly after . . . Decedent climbed the utility pole, the remaining crewman heard a loud noise from the top of the pole and turned to see . . . Decedent hanging limp from the utility pole.

27. The other members of . . . Decedent's crew were then forced to perform a pole[-]top rescue of . . . Decedent.

28. Resuscitation efforts were attempted[,] but [Decedent] did not survive his injuries.

29. As the foreman and/or employee in charge on October 29, 2009, Penland's duties and responsibilities were prescribed by . . . OSHA regulations and [the Pike Electric safety manual]. These duties included . . . ensuring that all lines to be worked on were de-energized, . . . all employees followed applicable safety rules, and . . . all of the employees in the work crew possessed the necessary information and work skills . . . to perform the work carefully.

30. . . . Defendants knew, or should have known, that groundmen and other untrained and inexperienced employees were . . . instructed to perform the inherently dangerous activities reserved for trained linemen.

. . .

33. . . . OSHA determined that Defendant Pike Electric had previously been cited by North Carolina OSHA for violations . . . in North Carolina as well as in other states where [it provides] similar services.

34. . . . Pike [Electric] . . . was aware that employees such as . . . Decedent were being placed in[] hazardous situations that were substantially certain to cause injury or death.

35. . . . [Pike Electric] was cited for [ten] serious safety violations in the [S]tate of Georgia in 2001 following the fatal electrocution of an employee while upgrading an electrical system.

. . .

37. . . . [Pike Electric] was cited for safety violations in the [S]tate of Florida in 2003 following [an employee injury] after [the injured employee] contact[ed] an energized power line.

38. Following [an] investigation [in this case], OSHA issued citations to [Pike Electric because]:

    a.   . . . An employee classified as a groundman[, *i.e.,* Decedent,] was allowed to perform work as a lineman for which he had not been trained[; and]

    b.   . . . [Decedent] was working in close proximity to 7200 volts . . . without wearing insulating gloves or . . . sleeves.

Defendants Pike Electric and Penland moved to dismiss Plaintiff's complaint in December of 2012 under Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure and section 97-10.1 ("the exclusivity provision") of the North Carolina Workers' Compensation Act ("the Act"). Pursuant to those rules, Defendants asserted that the trial court lacked subject matter jurisdiction to proceed with the case and that Plaintiff had failed to state a claim on which relief could be granted. The motions were heard on 18 February 2013 and, one week later, denied. Defendants appeal.

## Discussion

Defendants appeal the trial court's order denying their motions to dismiss under Rules 12(b)(1) and 12(b)(6). On both motions, we reverse as to Pike Electric and affirm as to Penland.

### I. Appellate Jurisdiction

[1] Defendants' appeal is interlocutory. It is well settled that an order denying a motion to dismiss made pursuant to the exclusivity provision of the Act and either Rule 12(b)(6) or Rule 12(b)(1) is interlocutory. *Trivette v. Yount*, __ N.C. App. __, __, 720 S.E.2d 732, 734 (2011) ("[T]he trial court's order denying Defendant's motion to dismiss pursuant to Rule 12(b)(1) . . . is interlocutory.") [hereinafter *Trivette I*], *affirmed in part, reversed in part on other grounds, and remanded*, 366 N.C. 303, 735 S.E.2d 306 (2012); *Block v. Cnty. of Person*, 141 N.C. App. 273, 276, 540 S.E.2d 415, 418 (2000) ("[A] denial of a motion pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) is an interlocutory order from which no appeal may be taken immediately.") (citation, brackets, certain punctuation, and internal quotation marks omitted). "An order is interlocutory if it is made during the pendency of an action and does not dispose of the case[,] but requires further action by the trial court in order to finally determine the entire controversy." *Trivette I*, __ N.C. App. at __, 720 S.E.2d at 734. Generally, a party cannot immediately appeal from an interlocutory order. *Davis v. Davis*, 360 N.C. 518, 524, 631 S.E.2d 114, 119 (2006). "The rationale behind [disallowing the immediate appeal of interlocutory orders] is that no final judgment is involved in such a denial and the movant is not deprived of any substantial right that cannot be protected by a timely appeal from a final judgment which resolves the controversy on its merits." *Block*, 141 N.C. App. at 276–77, 540 S.E.2d at 418. Because the trial court's denial of Defendants' motions to dismiss did not finally dispose of Plaintiff's claims in this case, it is interlocutory and, therefore, not generally subject to immediate appellate review.

Nevertheless, an interlocutory order may be reviewed on appeal when either "(1) . . . there has been a final determination as to one or more of the claims and the trial court certifies that there is no just reason to delay the appeal, [or] (2) . . . delaying the appeal would prejudice a substantial right." *Milton v. Thompson*, 170 N.C. App. 176, 178, 611 S.E.2d 474, 476 (2005). Because the trial court did not certify that there was no just reason to delay Defendants' appeal, review is proper only if the delay would affect a substantial right. We hold that it would.

### A. Denial of Defendants' Motions to Dismiss Under Rule 12(b)(1)

As Pike Electric points out, our Supreme Court has determined that the denial of a motion to dismiss under Rule 12(b)(1) and the exclusivity provision of the Act affects a substantial right "and will work injury if not corrected before final judgment . . . ." *See Burton v. Phoenix Fabricators & Erectors, Inc.*, 362 N.C. 352, 661 S.E.2d 242 (2008) (remanding to the Court of Appeals for consideration of the merits of an appeal that was brought on the denial of the defendant's Rule 12(b)(1) motion to dismiss the plaintiff's negligence action under the exclusivity provision of the Indiana workers' compensation statute). Therefore, Defendants' appeal as to that element of the denial of their respective motions to dismiss — Rule 12(b)(1) — is proper.

### B. Denial of Defendants' Motions to Dismiss Under Rule 12(b)(6)

In footnote 2 of his brief, Penland states that his argument "will focus [exclusively] on the trial court's ruling regarding [his motion to dismiss] pursuant to Rule 12(b)(6)." However, he goes on to attempt to preserve review of the denial of his motion to dismiss under Rule 12(b)(1) "should this Court determine that the trial court erred in dismissing his action under [Rule 12(b)(1)]." This is impermissible. Defendant's *ipse dixit* statement is not sufficient to preserve appellate review.

Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure states that, in order to preserve an issue for appellate review, a party must offer "reason or argument" in support of that issue. If not, the issue will be deemed abandoned. N.C.R. App. P. 28(b)(6). Because Penland intentionally omitted any reason or argument that the trial court erred in dismissing his motion under Rule 12(b)(1), that issue is deemed abandoned. Nevertheless, we elect to review the denial of Penland's motion to dismiss as a jurisdictional matter under Rule 12(b)(1). *Lee v. Winget Rd., LLC*, 204 N.C. App. 96, 98, 693 S.E.2d 684, 687 (2010) ("[A]n appellate court has the power to inquire into jurisdiction in a case before it at any time, even *sua sponte*.") (citation and internal quotation marks omitted).

In their briefs, Defendants state that their appeals of the trial court's denial of their motions to dismiss pursuant to Rule 12(b)(6) are properly before this Court under *Burton*. This is incorrect. The Supreme Court's opinion in *Burton* allowed appellate review of the trial court's denial of a motion to dismiss as affecting a substantial right pursuant to Rule 12(b)(1) and the exclusivity provision of another state's workers' compensation act. *Id.* It did not address whether jurisdiction was present

for an appeal of the denial of a motion to dismiss under *Rule 12(b)(6)*. Indeed, neither Pike Electric nor Penland has cited any case allowing review of the denial of a motion to dismiss under Rule 12(b)(6) and the exclusivity provision of the Act on grounds that such denial affects a substantial right.[2]

After reviewing the case law, we are unable find a decision of either appellate court addressing the validity of an interlocutory appeal from the denial of a motion to dismiss under Rule 12(b)(6) and the exclusivity provision. Accordingly, whether the trial court's denial of a motion to dismiss under Rule 12(b)(6) and the exclusivity provision of the Act is immediately appealable as affecting a substantial right is a matter of first impression.

As discussed above, our Supreme Court has determined that the denial of a motion to dismiss under Rule 12(b)(1) and the exclusivity provision of the Act is immediately appealable as affecting a substantial right. In this case, Defendants limit their arguments regarding the trial court's denial of their motions to dismiss under Rule 12(b)(6) to the issue of jurisdiction, arguing that Plaintiff failed to state a claim upon which relief may be granted because the superior court did not have jurisdiction to determine her claim since it arose under the exclusivity provision of the Act. Importantly, Defendants do not argue on appeal that Plaintiff failed to state a claim upon which relief can be granted pursuant to North Carolina tort law. Because the Supreme Court has determined that the denial of a motion to dismiss for lack of jurisdiction under the exclusivity provision of the Act affects a substantial right, we conclude that the denial of Defendants' Rule 12(b)(6) motions to dismiss is immediately appealable as affecting a substantial right to the extent that those motions were asserted pursuant to the exclusivity provision of the Act. Accordingly, to the extent that they involve the trial court's jurisdiction over this matter, we review Defendants' appeals on the merits.

---

2. The cases cited deal with denials of motions for summary judgment, denials of motions to dismiss under 12(b)(1), grants of summary judgment, grants of motions to dismiss under 12(b)(1), or grants of motions to dismiss under 12(b)(6) — not denials of motions to dismiss under 12(b)(6). *See, e.g., Trivette v. Yount,* 366 N.C. 303, 735 S.E.2d 306 (2012) (reviewing the trial court's denial of the defendants' motions to dismiss under 12(b) (1) and for summary judgment) [hereinafter *Trivette II*]; *Hamby v. Profile Products, LLC,* 361 N.C. 630, 632–33, 652 S.E.2d 231, 233 (2007) (reviewing the trial court's denial of summary judgment as to two parties and grant of summary judgment as to two others); *Blow v. DSM Pharms., Inc.,* 197 N.C. App. 586, 587, 678 S.E.2d 245, 247–48 (2009) (reviewing the trial court's *grant* of the defendant's motions to dismiss under Rules 12(b)(1) and 12(b) (6)); *Edwards v. GE Lighting Sys., Inc.,* 193 N.C. App. 578, 580, 668 S.E.2d 114, 116 (2008) (reviewing the trial court's denial of the defendants' motion for summary judgment).

## II. Standard of Review

"The standard of review on a motion to dismiss under Rule 12(b)(1) for lack of jurisdiction is *de novo*." *Dare Cnty. v. N.C. Dep't of Ins.*, 207 N.C. App. 600, 610, 701 S.E.2d 368, 375 (2010) (citations and internal quotation marks omitted).

Under Rule 12(b)(6),

> [t]he motion to dismiss . . . tests the legal sufficiency of the complaint. In ruling on the motion the [factual] allegations of the complaint must be viewed as admitted, and on that basis the court must determine as a matter of law whether the allegations state a claim for which relief may be granted.

*Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979) (citations omitted). On a motion to dismiss under Rule 12(b)(6), the court is not, however, required to accept mere conclusory allegations, unwarranted deductions of fact, or unreasonable inferences as true. *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008) (citation and internal quotation marks omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 167 L. Ed. 2d 929, 934 (2007) ("While a complaint attacked by a [Federal] Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions[. Indeed,] a formulaic recitation of the elements of a cause of action will not do[.]") (citations, internal quotation marks, and brackets omitted).

## III. Analysis

The exclusivity provision of the Act states that "the rights and remedies [provided to] the employee, his dependents, next of kin, or personal representative shall exclude all other rights and remedies of the employee . . . as against the employer at common law or otherwise on account of . . . injury or death." N.C. Gen. Stat. § 97-10.1 (2011).

> The social policy behind [this provision] is that injured workers should be provided with dignified, efficient[,] and certain benefits for work-related injuries and that the consumers of the product are the most appropriate group to bear the burden of the payments. The most important feature of the typical workers' compensation scheme is that the employee and his dependents give up their common law right to sue the employer for negligence in

> exchange for limited but assured benefits. Consequently[,]
> the negligence and fault of the injured worker ordinarily
> is irrelevant.

*Pleasant v. Johnson*, 312 N.C. 710, 712, 325 S.E.2d 244, 246–47 (1985). Under the exclusivity provision, a worker is generally barred from bringing an action in our courts of general jurisdiction against either his employer or a co-employee. *Id.* at 713, 325 S.E.2d at 247. Instead, the worker must pursue his or her action before the North Carolina Industrial Commission.

In cases involving intentional injury by an employer or co-employee, however, our Supreme Court has stated that the worker may bring suit at common law. *Id.* Over time, this rule has been applied to two different circumstances. First, when a worker wishes to maintain an action against his *employer*, our Supreme Court has directed us to ask (a) *whether the worker suffered injury or death* and (b) *whether the employer intentionally engaged in misconduct knowing that such conduct was substantially certain to cause serious injury or death.* *Woodson v. Rowland*, 329 N.C. 330, 340–41, 407 S.E.2d 222, 228 (1991). If the answer to both questions is "yes," then the worker "or the personal representative of the estate[,] in [the] case of death, may pursue a civil action against the employer." *Id.* Second, when a worker wishes to maintain an action against his co-employee(s),[3] our Supreme Court has directed that we ask *whether the co-employee(s) acted with willful, wanton, and reckless negligence. Pleasant,* 312 N.C. at 717–18, 325 S.E.2d at 250. If so, then the worker may receive benefits under the Act and maintain a separate common law action against his co-employee(s). *Id.*

### A. The Woodson Employer Exception

[2] As discussed above, a worker seeking to recover against his employer at common law must allege that the employer intentionally engaged in misconduct knowing that such conduct was substantially certain to cause serious injury or death and that the worker in fact suffered such injury or death. *Woodson*, 329 N.C. at 340–41, 407 S.E.2d at 228. "Such misconduct is tantamount to an intentional tort[,]" and our Supreme Court has offered the following guidance when determining whether an employer's conduct qualifies:

> The most aggravated conduct is where the actor actually
> intends the probable consequences of his conduct. One

---

3. "The Court of Appeals has long accepted, and we agree, that for purposes of the Act, supervisors and those they supervise are treated as co-employees." *Trivette II,* 366 N.C. at 309–10, 735 S.E.2d at 311.

who intentionally engages in conduct knowing that particular results are substantially certain to follow also intends the results for purposes of tort liability. Intent is broader than a desire to bring about physical results. It extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does. This is the doctrine of "constructive intent." As the probability that a certain consequence will follow decreases[] and becomes less than substantially certain, the actor's conduct loses the character of intent, and becomes mere recklessness. As the probability decreases further[] and amounts only to a risk that the result will follow, it becomes ordinary negligence.

. . . Lying between intent to do harm, which includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence, there is a penumbra of what has been called "quasi intent." To this area, the words "willful," "wanton," or "reckless," are customarily applied[.]

*Id.* at 341, 407 S.E.2d at 228–29 (citations, certain internal quotations marks, brackets, and ellipses omitted).

In *Woodson*, the decedent worked for a subcontractor that had been retained to repair a sewer line. *Id.* at 334, 407 S.E.2d at 225. In order to repair the line, the subcontractor was required to dig two trenches. *Id.* Though the subcontractor was responsible for digging both trenches, the general contractor provided men to help dig the first. *Id.* at 335, 407 S.E.2d at 225. The subcontractor intended to build both trenches without the use of a number of required safety precautions, including a "trench box."[4] *See id.* Because the foreman for the general contractor refused to allow his men to work on the first trench without such a box, however, one was provided by the subcontractor. *Id.* The second trench never received a trench box. *Id.*

One Sunday, the decedent was laying pipe for the subcontractor in the second trench. *Id.* Though the box used in the first trench was available for protection, the subcontractor's president expressly declined to

---

[4] "Trench boxes are . . . intended primarily to protect workers from cave-ins and similar incidents." *Excavations: Hazard Recognition in Trenching and Shoring*, OSHA Technical Manual (OTM), section v, chapter 2 (October 1, 2013), https://www.osha.gov/dts/osta/otm/otm_v/otm_v_2.html.

employ it. *Id.* The trench later collapsed, and the decedent was killed. *Id.* at 336, 407 S.E.2d at 225–26. Observing the worksite after the accident, the general contractor's foreman "characterized it as 'unsafe' and stated that he 'would never put a man in it.' " *Id.* at 336, 407 S.E.2d at 226. The decedent's spouse later filed suit, and the defendant subcontractor moved for summary judgment. *Id.* The trial court granted that motion, the Court of Appeals affirmed, and the Supreme Court reversed. *Id.* at 336–37, 407 S.E.2d at 226.

In reversing the Court of Appeals, the Supreme Court noted that on summary judgment the plaintiff need only forecast sufficient evidence "to show that there is a genuine issue of material fact as to whether [the president's] conduct satisfies the substantial certainty standard[.]" *Id.* at 345, 407 S.E.2d at 231. Accordingly, the Court cited the following evidence as sufficient to create a genuine issue of material fact and allow the case to proceed to trial:

> [The president's] knowledge and prior disregard of dangers associated with trenching; his presence at the site and opportunity to observe the hazards; his direction to proceed without the required safety procedures; [the foreman's] experienced opinion that the trench was unsafe; and [an expert witness's] scientific soil analysis[, which determined that the trench was "substantially certain to fail"].

*Id.* at 345–46, 407 S.E.2d at 231–32.

Under *Woodson*, Plaintiff argues that Pike Electric should be subject to a negligence action at common law. In support of that position, Plaintiff cites *Arroyo v. Scottie's Prof'l Window Cleaning, Inc.*, 120 N.C. App. 154, 461 S.E.2d 13 (1995), where the plaintiff was injured while washing windows at an office building in the Research Triangle Park. *Id.* at 158, 461 S.E.2d at 15–16. In that case, the company's foreman instructed the plaintiff and a colleague to wash certain windows from the roof of a building, without fall protection. *Id.* at 157, 461 S.E.2d at 15. Because of the unusual geometric design of the building, the foreman decided that safer methods were "too cumbersome and time consuming." *Id.* Later, the foreman learned that the plaintiff had been locking arms with his colleague in order to keep balance; the foreman instructed them to stop. *Id.* Believing that they would be fired if they did not comply, the plaintiff and his colleague began washing the windows separately. *Id.* at 158, 461 S.E.2d at 15. Shortly thereafter, the plaintiff lost his footing, fell, and suffered a serious and permanent injury. *Id.* at 158, 461

**ESTATE OF GARY VAUGHN v. PIKE ELECTRIC, LLC**

[230 N.C. App. 485 (2013)]

S.E.2d at 15 16. The plaintiff brought suit, and the company successfully moved to dismiss under Rule 12(b)(6). *Id.* at 154, 461 S.E.2d at 14.

The plaintiff appealed, and we reversed the trial court's dismissal pursuant to the plaintiff's allegations that the company "was aware that the required safe methods for cleaning highly elevated windows were not being practiced, and that [the company's] management accepted and encouraged [that] fact."[5] *Id.* at 159, 461 S.E.2d at 16–17. In so holding, we noted that the window washing company had been aware of the foreman's "past record of ignoring safety requirements." *Id.*

Plaintiff argues that the facts alleged in this case are "far more egregious and substantially certain to cause serious injury or death than those present in *Arroyo*" and, thus, warrant application of the *Woodson* exception. We disagree.

To the extent that the facts in *Arroyo* are similar to those in this case,[6] they must be considered in light of subsequent opinions by our Supreme Court. Approximately eight years after *Arroyo*, in *Whitaker v. Town of Scotland Neck, C.T.*, 357 N.C. 552, 597 S.E.2d 665 (2003), the Court again addressed the *Woodson* exception. In that case, the decedent was employed by a North Carolina municipality to assist in the operation of a garbage truck. *Id.* at 553, 597 S.E.2d at 666. While the decedent was hoisting a dumpster, the truck's latching mechanism gave way, allowing the dumpster to swing toward the decedent and pin him against the truck. *Id.* at 553–54, 597 S.E.2d at 666. The decedent ultimately died from his injuries. *Id.* at 554, 597 S.E.2d at 666. Investigators later determined that the truck's latching mechanism had been broken for a number of months, and that the defect had been reported to the decedent's supervisor. *Id.* The Department of Labor also concluded that the accident had resulted from employment conditions not in compliance with OSHA safety standards. *Id.*

The decedent's estate filed suit, and the trial court granted the municipality's motion for summary judgment. *Id.* at 554–56, 597 S.E.2d at 666–67. The Court of Appeals reversed the trial court under a multi-factor

---

5. Among other things, the plaintiff alleged that the company was aware that permitting or requiring a window washer to work from a great height without a safety line or net was a violation of OSHA rules and safety guidelines and substantially certain to cause serious injury or death. *Id.* at 156, 461 S.E.2d at 14. The plaintiff also alleged that the company nonetheless required such activities on a regular basis, citing previous fines and citations by the Department of Labor for the same. *Id.*

6. We do not suggest that they are.

test, and the Supreme Court reversed that decision in turn, upholding the trial court's original grant of summary judgment. *Id.* In so holding, the Supreme Court noted that "*Woodson* . . . represents a narrow holding in a fact-specific case . . . [; the] exception applies only in the most egregious cases of employer misconduct. Such circumstances exist where there is uncontroverted evidence of the employer's intentional misconduct . . . ." *Id.* at 557, 597 S.E.2d at 668. Distinguishing *Woodson* from *Whitaker*, the Court pointed out that, in *Woodson*, the company president

> was on the job site and observed first-hand the obvious hazards of the deep trench in which he directed the decedent-employee to work. Knowing that safety regulations and common trade practice mandated the use of precautionary shoring, the . . . president nonetheless disregarded all safety measures and intentionally placed his employee into a hazardous situation in which experts concluded that only one outcome was substantially certain to follow: an injurious, if not fatal, cave-in of the trench.

*Id.* at 557–58, 597 S.E.2d. at 668. The Court also noted that: (1) there was no record showing the municipality had been cited for multiple, significant violations of safety regulations in the past; (2) the municipality's supervisors were not on site at the time of the accident; and (3) there was no evidence that the municipality recognized the immediate hazards of its operation and consciously chose to forgo critical safety precautions, as in *Woodson*. *Id.* at 558, 597 S.E.2d at 668–69. Further, the Court pointed out that the decedent was not expressly instructed to proceed in an obviously hazardous situation and there was no evidence that the defendants knew the latching mechanism was substantially certain to fail or that failure would cause serious injury. *Id.*[7]

In this case, the facts articulated by Plaintiff against Pike Electric present a close question of law and fact. Nevertheless, we conclude that they align more closely with those in *Whitaker* than with those in *Woodson* and *Arroyo*. As in *Whitaker*, there is no evidence that Pike Electric had any knowledge of Penland's decision to instruct Decedent to climb the utility pole. Plaintiff has not alleged that the Pike Electric management was present at the site and had the opportunity to observe its hazards, as in *Woodson*, or that Decedent's supervisor had a prior history of ignoring safety requirements, as in *Arroyo*. Further, Plaintiff

---

7. Pike Electric alleges in its brief, and we have found nothing to contradict this, that no reported case has allowed a plaintiff to proceed to trial under *Woodson* since the Court's decision in *Whitaker*.

ESTATE OF GARY VAUGHN v. PIKE ELECTRIC, LLC

[230 N.C. App. 485 (2013)]

has not included any direct allegations that the Pike Electric management accepted and encouraged the particular risk imposed on Decedent by Penland or that it was even aware of that risk.[8] Indeed, as Plaintiff points out in her complaint, Penland gave the instruction to Decedent to climb the utility pole *in clear violation of Pike Electric's own work methods and safety manuals.* This suggests that the Pike Electric company, unlike Penland, did not intend for any of its groundmen, including Decedent, to climb utility poles and de-energize transformers.

Plaintiff's allegations against Pike Electric are essentially limited to conclusory statements, asserting (1) that "Defendants knew[] or should have known" that Penland's behavior was common practice, or (2) that "Pike [Electric] . . . was aware . . . employees such as . . . Decedent were being placed in[] hazardous situations that were substantially certain to cause serious injury or death." Plaintiff offers no reason that Pike Electric should have known or was already aware of Penland's actions beyond allegations that Pike Electric had been cited for factually unspecific safety violations occurring in North Carolina and other states. Those violations occurred as many as eight years before Decedent died, and Plaintiff does not provide a factual lens in her complaint through which they can be understood. As such, Plaintiff's conclusory allegation regarding Pike Electric's intention is unwarranted.

Simply put, Plaintiff offers no basis to believe that Pike Electric was aware of, intended, or was substantially certain that Penland's actions on that day would result in Decedent's death. Therefore, given the "narrow" application of the *Woodson* exception under *Whitaker*, we hold that Plaintiff failed to allege "uncontroverted evidence of [Pike Electric's] intentional misconduct." *See id.* at 557, 597 S.E.2d at 668. Plaintiff's deductions of fact and inferential allegations do not allege egregious employer misconduct on the part of Pike Electric and, for that reason, her argument is overruled. *See id.* Accordingly, we reverse the trial court's denial of Pike Electric's motions to dismiss under Rules 12(b)(1) and 12(b)(6).

---

8. As discussed, *infra,* Plaintiff only asserts that Defendants knew or should have known that "groundmen and other untrained and inexperienced employees were being instructed to perform the inherently dangerous activities reserved for trained linemen." Support for this assertion is offered in the form of allegations that Pike Electric was cited for safety violations in the past, but not by any allegations that Pike Electric, specifically, was aware of the dangers in this case and intentionally disregarded them, as in *Woodson.* This proffered support, *without more,* is not sufficient to raise an inference that Pike Electric knew or should have known about Penland's specific instruction to Decedent. *See Strickland,* 194 N.C. App. at 20, 669 S.E.2d at 73.

## B. The Pleasant Co-Employee Exception

**[3]** As noted *supra*, a worker may also bring suit against his *co-employee* at common law when the co-employee injured the worker by willful, wanton, and reckless negligence. *Pleasant*, 312 N.C. at 714, 325 S.E.2d at 247. Under *Pleasant*, "willful, reckless, and wanton negligence inhabits a twilight zone which exists somewhere between ordinary negligence and intentional injury." *Id.* Willful negligence, despite the apparent contradiction in terms, is defined as "the intentional failure to carry out some duty imposed by law or contract which is necessary to the safety of the person or property to which it is owed." *Id.* at 714, 325 S.E.2d at 248. Wanton conduct is defined "as an act manifesting a reckless disregard for the rights and safety of others." *Id.* This does not require an actual intent to injure, but can be shown constructively when the co-employee's "conduct threatens the safety of others and is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness equivalent in spirit to actual intent is justified." *Id.* at 715, 325 S.E.2d at 248. Therefore, willful, wanton, and reckless negligence is present when a co-employee intentionally fails to carry out some duty with manifest indifference to the consequences resulting from that failure.

In *Pleasant*, a co-employee attempted to drive his truck as close to the plaintiff as possible without actually striking him. *Id.* at 711, 325 S.E.2d at 246. Though the co-employee merely intended to frighten the plaintiff, the co-employee miscalculated and struck him, seriously injuring the plaintiff's knee. *Id.* "At the close of the plaintiff's evidence[,] the [co-employee] moved for and was granted a directed verdict." *Id.* On review, our Supreme Court held that the co-employee's behavior constituted willful, wanton, and reckless negligence. *Id.* at 718, 325 S.E.2d at 250. Therefore, the Supreme Court reasoned, the plaintiff's case could proceed at common law. *Id.*

Eight years later, in *Pendergrass v. Card Care, Inc.*, 333 N.C. 233, 236, 424 S.E.2d 391, 393 (1993), our Supreme Court again evaluated the applicability of the exclusivity provision as against a co-employee. In that case, the plaintiff's arm was seriously injured when it was caught in a "final inspection machine[,] which [the plaintiff] was operating as an employee . . . ." *Id.* The plaintiff alleged in his complaint that his co-employees were grossly and wantonly negligent for "directing [him] to work at [a] final inspection machine when they knew that certain dangerous parts of the machine were unguarded, in violation of OSHA regulations and industry standards." *Id.* at 238, 424 S.E.2d at 394. The trial court allowed the defendant co-employees' motion to dismiss under

Rule 12(b)(6) and the exclusivity provision, and the plaintiff appealed. *Id.* at 236–37, 424 S.E.2d at 393.

In declining to apply *Pleasant*, our Supreme Court offered the following rationale:

> Although [the co-employees] may have known certain dangerous parts of the machine were unguarded when they instructed [the plaintiff] to work at the machine, we do not believe this supports an inference that they intended that [the plaintiff] be injured or that [the co-employees] were manifestly indifferent to the consequences of his doing so.

*Id.* at 238, 424 S.E.2d at 394. Given that reasoning, Penland asserts that this Court "need look no further than *Pendergrass* to determine that [his] Rule 12(b)(6) [m]otion to [d]ismiss should have been granted by the trial court." Despite that invitation, we broaden our review to include our Supreme Court's most recent opinion on this issue. *Trivette II*, 366 N.C. at 303, 735 S.E.2d at 306.

In *Trivette II*, the plaintiff was sprayed "about her head and upper body" with a fire extinguisher that had been jokingly placed on her desk by her supervisor, who knew she had a medical condition. *Id.* at 305, 312, 735 S.E.2d at 308, 312. When the plaintiff asked her supervisor to remove the fire extinguisher, he scoffed at her requests and assured her that it would not discharge. *Id.* at 312, 735 S.E.2d at 312. The extinguisher went off despite the supervisor's assurances and covered the plaintiff with a fine, white, powdery mist. *Id.* The plaintiff alleged that this resulted in a relapse and aggravation of her pre-existing medical condition, and she brought suit in superior court. *Id.* at 305, 735 S.E.2d at 306. The supervisor moved for summary judgment and dismissal under Rule 12(b)(1). *Id.* The trial court denied both motions, and the supervisor appealed. *Id.*

In resolving that case, the Supreme Court first determined that this Court correctly upheld the trial court's denial of the supervisor's motion to dismiss under Rule 12(b)(1), but declined to discuss the matter at any length.[9] *Id.* at 310, 735 S.E.2d at 311. Next, the Court rejected our decision affirming the trial court's denial of the defendant's motion for summary judgment on grounds that the supervisor could not have been aware of the consequences of his conduct, pointing out that

---

9. This Court similarly offered little discussion, simply noting that the plaintiff had alleged that the "[supervisor's] conduct was willful, wanton, and recklessly negligent . . . ." *Trivette I*, __ N.C. App. at __, 720 S.E.2d at 737.

> even unquestionably negligent behavior rarely meets the high standard of "willful, wanton, and reckless" negligence established in *Pleasant*. . . . [T]he risk that the discharge of a fire extinguisher might cause a relapse of a neuromuscular disease is less apparent. Despite the assertion . . . that [the] defendant created a hazardous environment and the fire extinguisher was "unsafe equipment," no evidence indicates that the extinguisher or its effluvium presented any danger, either immediate or latent, and the record is silent as to whether the extinguisher bore any warning labels. Even if we assume that [the] defendant knew that an unexpected discharge would be messy and unpleasant, we do not believe the evidence before us . . . supports an inference that [the] defendant was willfully, wantonly, and recklessly negligent, or that he was manifestly indifferent to the consequences of an accidental outburst.

*Id.* at 312–13, 735 S.E.2d at 312–13.

Given this legal landscape, Penland argues that the *Pleasant* exception is not applicable because the facts in that case "were considerably more egregious than those alleged [here]" and because the facts in this case are "no more egregious" than those alleged in *Pendergrass*. Arguing that *Pendergrass* and *Trivette* have "limited the circumstances in which an injured employee . . . may sue a co-worker [under *Pleasant*]," Penland contends that Plaintiff's allegations are insufficient because they mainly center on his simple instruction that Decedent climb a potentially dangerous power pole. Therefore, Penland concludes, Plaintiff's complaint does not support an inference that Penland either intended Decedent to be injured or was manifestly indifferent to the consequences of doing so. We are not persuaded.

In her complaint, Plaintiff included the following allegations against Penland: "In asking, directing, instructing[,] and requesting that . . . Decedent utilize a 'shotgun stick' to de-energize the transformer to be retrofitted[,] while knowing that Decedent had not been trained to do so, . . . Penland demonstrated willful negligence, wanton negligence, reckless negligence, a reckless disregard for the rights and safety of others, and a manifest indifference to the safety of others, including . . . Decedent." We find that this behavior is not less egregious than that of the co-employee in *Pleasant*, who intentionally aimed his vehicle at the plaintiff despite the obvious risk of personal injury or death. In addition, for purposes of Rule 12(b)(1), we similarly find that this behavior is at least as "egregious" as, if not more than, the supervisor's decision to

place a fire extinguisher on his subordinate's desk in *Trivette II* and the co-employees' instruction to the plaintiff in *Pendergrass* to work at the final inspection machine.

Unlike the co-employees in *Pendergrass*, who may have known about certain dangerous elements of the final inspection machine, Plaintiff alleges that Defendant Penland knowingly directed Decedent, an untrained groundman who had previously worked as a truck driver, to climb a power pole and work on highly dangerous and "near energized" power lines, without the necessary training, equipment, or experience. Though it cannot be inferred from these allegations that Penland *intentionally injured* Decedent by requiring him to de-energize the transformer, we hold that his alleged direction to send Decedent up that utility pole despite Decedent's severe lack of training and expertise is sufficient to create an inference that Penland was manifestly indifferent to the consequences of his actions under either Rule 12(b)(1) or Rule 12(b)(6). *See Regan v. Amerimark Bldg. Prods., Inc.*, 118 N.C. App. 328, 332, 454 S.E.2d 849, 852 (1995) (holding that the trial court erred in allowing the supervisor's motion to dismiss under Rule 12(b)(6) when the plaintiff's hand was caught and pulled into a paint machine allegedly because the defendants had failed to provide proper guarding on the machine, failed to maintain the emergency switch at the plaintiff's station, assigned the plaintiff to work at the station despite knowing that the emergency switches were not functioning, and knew it was substantially certain that the plaintiff would assume the switches were functional and be seriously injured or killed); *see also Woodson*, 329 N.C. at 342, 407 S.E.2d at 229 ("[C]ivil actions against employers [are] grounded on more aggravated conduct than actions against co-employees.").

Because our Supreme Court has instructed that an employee may exhibit willful, wanton, and reckless negligence *either* when he intentionally injures a coworker or when he does so with manifest disregard to the consequences of his actions, *see, e.g., Pendergrass*, 333 N.C. at 238, 424 S.E.2d at 394, we affirm the trial court's denial of Penland's motion to dismiss under Rules 12(b)(1) and 12(b)(6).

REVERSED in part; AFFIRMED in part.

Judges CALABRIA and ELMORE concur.