Aym Techs., LLC v. Rodgers, 2018 NCBC 14.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

AYM TECHNOLOGIES, LLC,

          Plaintiff,

v.

GENE RODGERS; SCOPIA
CAPITAL MANAGEMENT LP;
SCOPIA HCM PARTNERS, LLC;
and COMMUNITY BASED CARE,
LLC,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 21788

**ORDER AND OPINION
ON DEFENDANTS'
MOTIONS TO DISMISS**

1.    **THIS MATTER** is before the Court on the following motions in the above captioned case: (i) Defendants Scopia Capital Management LP ("Scopia") and Scopia HCM Partners, LLC's ("Scopia HCM") (collectively, the "Scopia Defendants") motion to dismiss under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure for lack of personal jurisdiction (the "Scopia Defendants' 12(b)(2) Motion") and motion to dismiss under Rule 12(b)(5) for inadequate service of process (the "Scopia Defendants' 12(b)(5) Motion"); (ii) the Scopia Defendants and Defendant Community Based Care, LLC's[1] ("CBC") (collectively, the "Corporate Defendants") motion to dismiss under Rule 12(b)(6) (the "Corporate Defendants' Motion to Dismiss"); and (iii) Defendant Gene Rodgers's ("Rodgers") motion to dismiss under Rule 12(b)(6) ("Rodgers's Motion to Dismiss") (collectively with the Corporate Defendants' Motion to Dismiss, the

---

[1] CBC advised the Court at the May 17, 2017 hearing on the Motions that it was incorrectly identified in the Complaint as Community Based Care, LLP. With the parties' consent, the Court has modified the case caption accordingly.

"12(b)(6) Motions"). The 12(b)(6) Motions, the Scopia Defendants' 12(b)(2) Motion, and the Scopia Defendants' 12(b)(5) Motion shall be referenced collectively hereafter as the "Motions."

2. Having considered the Motions, the parties' briefs and related submissions in support of and in opposition to the Motions, the Complaint, the appropriate evidence of record on the Scopia Defendants' 12(b)(2) and 12(b)(5) Motions, and the arguments of counsel at the May 17, 2017 hearing on the 12(b)(6) Motions and the May 17, 2017 and October 3, 2017 hearings on the Scopia Defendants' 12(b)(2) and 12(b)(5) Motions, the Court hereby **GRANTS in part** and **DENIES in part** each of Defendants' Motions.

> *Terpening Wilder Moors PLLC, by Raboteau T. Wilder Jr. and William R. Terpening, for Plaintiff Aym Technologies, LLC.*
>
> *Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Benjamin R. Holland and Lia A. Lesner, and Pollack Solomon Duffy LLP, by Barry S. Pollack, for Defendants Scopia Capital Management LP, Scopia HCM Partners, LLC, and Community Based Care, LLC.*
>
> *Bell Davis & Pitt, P.A., by Jason B. James and Edward B. Davis, for Defendant Gene Rodgers.*

Bledsoe, Judge.

I.

PROCEDURAL BACKGROUND

3. Aym Technologies, LLC ("Aym" or "Plaintiff") filed this action on December 5, 2016 against Defendants, asserting claims against Rodgers for breach of contract and against all Defendants for misappropriation of trade secrets, conversion, unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, and tortious interference

with prospective economic advantage. Aym seeks both monetary damages and injunctive relief on its claims.

4. On February 20, 2017, Scopia and Scopia HCM moved to dismiss Aym's Complaint for lack of personal jurisdiction under Rule 12(b)(2) and for inadequate service of process under Rule 12(b)(5). On the same day, Scopia, Scopia HCM, and CBC moved to dismiss Aym's Complaint for failure to state a claim under Rule 12(b)(6).

5. On March 31, 2017, Rodgers filed an answer to the Complaint and also moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6).[2]

6. The Court held a hearing on the Motions on May 17, 2017, at which all parties were represented by counsel. At the hearing, Aym's counsel reiterated a request made in Aym's briefing on the Motions that the parties be permitted to conduct jurisdictional discovery prior to the Court's determination of the Scopia Defendants' 12(b)(2) Motion.

7. On May 19, 2017, the Court entered an order directing the parties to engage in jurisdictional discovery concerning the Scopia Defendants' 12(b)(2) Motion and staying all other discovery in the case pending the Court's resolution of the Motions.

---

[2] Rodgers filed his answer at 3:45 PM on March 31, 2017 and his motion to dismiss thirty-nine minutes later at 4:24 PM that same day. This Court has recently held that, to be timely, "a Rule 12(b) motion for failure to state a claim must be made before filing an answer." *New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *25 (N.C. Super. Ct. Aug. 18, 2017) (Robinson, J.). As a result, Rodgers's Rule 12(b)(6) motion was untimely. Because Plaintiff did not challenge Rodgers's Motion to Dismiss on timeliness grounds, however, the Court concludes that Plaintiff has waived any objection to the timeliness of Rodgers's Motion. *See, e.g.*, *Badin Shores Resort Owners Ass'n v. Handy Sanitary Dist.*, No. COA17-718, 2018 N.C. App. LEXIS 76, at *14–16 (N.C. Ct. App. Feb. 6, 2018). The Court will therefore consider Rodgers's Motion in the exercise of its discretion.

Jurisdictional discovery concluded on August 31, 2017, and the Court held a further hearing on the Scopia Defendants' 12(b)(2) and 12(b)(5) Motions on October 3, 2017. All parties were represented by counsel at the hearing.

8. The Court elected to delay resolution of the 12(b)(6) Motions until jurisdictional discovery and supplemental briefing and argument had been received on the Scopia Defendants12(b)(2) and 12(b)(5) Motions.

9. The Motions are now ripe for resolution.

II.

SCOPIA DEFENDANTS' 12(b)(2) MOTION

10. A North Carolina court has jurisdiction over a nonresident defendant if (i) statutory authority for the exercise of jurisdiction under the State's long-arm statute, N.C. Gen. Stat. § 1-75.4, exists and (ii) the exercise of jurisdiction comports with due process under federal law. *See, e.g.*, *Skinner v. Preferred Credit*, 361 N.C. 114, 119, 638 S.E.2d 203, 208 (2006). The Court need not consider the long-arm statute here, however, as our courts have made clear that "the question of statutory authority collapses into one inquiry—whether defendant has the minimum contacts necessary to meet the requirements of due process." *Cambridge Homes of N.C., L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 412, 670 S.E.2d 290, 295 (2008) (quoting *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671, 541 S.E.2d 733, 736 (2001)).

11. "To satisfy the due process prong of the personal jurisdiction analysis, there must be sufficient 'minimum contacts' between the nonresident defendant and our

state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Skinner*, 361 N.C. at 122, 638 S.E.2d at 210 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In determining whether a defendant has sufficient minimum contacts, North Carolina courts consider '(1) the quantity of the contacts, (2) the nature and quality of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest of the forum state, and (5) the convenience to the parties.'" *Worley v. Moore*, 2017 NCBC LEXIS 15, at *20–21 (N.C. Super. Ct. Feb. 28, 2017) (quoting *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 696, 611 S.E.2d 179, 184 (2005)).

12. A court may exercise personal jurisdiction through either general jurisdiction or specific jurisdiction. *Skinner*, 361 N.C. at 122, 638 S.E.2d at 210. General jurisdiction "may be asserted over [a] defendant even if the cause of action is unrelated to [the] defendant's activities in the forum as long as there are sufficient 'continuous and systematic' contacts between [the] defendant and the forum state," *Replacements, Ltd. v. Midwesterling*, 133 N.C. App. 139, 145, 515 S.E.2d 46, 51 (1999) (citation omitted), "[so] as to render [defendant] essentially at home in the forum state," *Worley*, 2017 NCBC LEXIS 15, at *54 (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (quotation marks omitted)).

13. In contrast, "[s]pecific jurisdiction exists when 'the controversy arises out of the defendant's contacts with the forum state.'" *Lab. Corp. of Am. Holdings v. Caccuro*, 212 N.C. App. 564, 569, 712 S.E.2d 696, 701 (2011) (quoting *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 366, 348 S.E.2d 782, 786 (1986)); *see also*

*Walden v. Fiore*, 134 S. Ct. 1115, 1121–22 (2014). Those contacts must not be based solely on "random, fortuitous, or unilateral activity of another party or a third person," *Cambridge Homes*, 194 N.C. App. at 413, 670 S.E.2d at 296, and the exercise of specific jurisdiction requires that "a defendant ha[ve] 'fair warning' that he may be sued in a state for injuries arising from activities that he 'purposefully directed' toward that state's residents," *Tom Togs*, 318 N.C. at 366, 348 S.E.2d at 786 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). The Court's focus should be "upon the relationship among the defendant, this State, and the cause of action." *Id.* "Therefore, the trial court must carefully scrutinize the facts of each case to determine if a defendant's dispute-related contacts with the forum state constitute sufficient minimum contacts to exercise personal jurisdiction over the defendant in the forum state." *Soma Tech., Inc. v. Dalamagas*, 2017 NCBC LEXIS 26, at *11–12 (N.C. Super. Ct. Mar. 24, 2017) (citing *Deer Corp. v. Carter,* 177 N.C. App. 314, 327, 629 S.E.2d 159, 169 (2006)).

14. When a defendant challenges the court's jurisdiction under Rule 12(b)(2), the burden falls on the plaintiff to establish that grounds for asserting jurisdiction exist. *Williams v. Inst. for Computational Studies at Colo. State Univ.*, 85 N.C. App. 421, 424, 355 S.E.2d 177, 179 (1987); *see also Mannise v. Harrell*, 791 S.E.2d 653, 659 (N.C. Ct. App. 2016) (reversing finding of personal jurisdiction where plaintiff failed to rebut defendant's affidavit stating that he had no contacts with North Carolina).

15. Where, as here, both parties submit competing affidavits and depositions, and the trial court holds a hearing on personal jurisdiction, the trial court should consider the matter as if an evidentiary hearing had occurred. *See, e.g., Deer Corp.,* 177 N.C. App. at 322, 629 S.E.2d at 166 (where trial court held hearing and considered deposition testimony, the "case had moved beyond the procedural standpoint of competing affidavits to an evidentiary hearing"). In such circumstances, the Court must "act as fact-finder and decide the question of personal jurisdiction by a preponderance of the evidence," *id.* (internal citation omitted), with the plaintiff bearing the "ultimate burden of proving jurisdiction," s*ee, e.g., Parker v. Town of Erwin,* 243 N.C. App. 84, 97, 776 S.E.2d 710, 721 (2015).

16. Accordingly, based on the Court's review of the verified Amended Complaint, the parties' exhibits, the submitted depositions and affidavits, other appropriate evidence of record, and the arguments of counsel at the hearings on the 12(b)(2) Motion, the Court acts as fact-finder and makes the following findings of fact solely for the purposes of deciding the 12(b)(2) Motion.

A. Findings of Fact

17. Defendant Scopia was formed as a limited partnership organized under the laws of the state of Delaware with its principal place of business in New York, New York. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 1, at ¶ 2 [hereinafter "Morse Aff."], ECF No. 52.3.) Neither Scopia's general partner, nor any of its limited partners, is a resident of North Carolina, and instead each is a resident of New York. (Morse Aff. ¶ 2.) Scopia's limited partnership agreement designates New York as the

venue for any disputes arising out of the agreement. (Morse Aff. ¶ 2.) Scopia provides investment management services for Scopia HCM from Scopia's New York offices. (Morse Aff. ¶ 4.)

18. Defendant Scopia HCM was created as a limited liability company under the laws of the State of Delaware, effective June 12, 2015, and has its principal place of business in New York. (Morse Aff. ¶ 3.) None of its members reside in North Carolina, and its managing member is a limited liability company whose members are domiciled in New York. (Morse Aff. ¶3.) As set forth in its Limited Liability Company Agreement, dated August 7, 2015, Scopia HCM was formed for the sole purpose of serving as a "fund through which the assets of its Members may be utilized in holding, trading, and otherwise investing in a roll-up of private companies involving health care services in North Carolina[.]" (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 2, at 1 [hereinafter "Operating Agreement"], ECF No. 52.3.) The operating agreement specifically identified CBC as the vehicle for the "roll-up"—i.e., the acquisitions—of North Carolina private health care companies. (Operating Agreement 1.)

19. Defendant CBC was created as a limited liability company under the laws of the State of Delaware, effective June 30, 2015, under the name Scopia Home Holdings, LLC. (Quinn Aff. Ex. 5, ECF No. 36.) CBC changed its name from Scopia Home Holdings, LLC sometime prior to November 17, 2015. (Quinn Aff. Ex. 5.) CBC has its principal place of business in Lenoir, North Carolina, (Quinn Aff. Ex. 6), and there is no dispute that CBC is subject to personal jurisdiction in this Court. CBC is

"a holding company formed to provide services to the Intellectual and Developmental Disabilities ('I/DD') market in North Carolina and surrounding states" through wholly owned North Carolina subsidiaries. (Quinn Aff. Ex. 7.)

20. Thus, by way of summary, Scopia provides investment management services to Scopia HCM, which in turn owns CBC, which is itself the owner of various North Carolina subsidiaries that provide services in the I/DD market in North Carolina. (Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Ex. K, at 2, ECF No. 53.11.) Unlike CBC, neither Scopia nor Scopia HCM has offices or employees in North Carolina or regularly conducts business in this State. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. 1, ECF No. 52.)

21. Aym is a North Carolina limited liability company engaged in the business of providing comprehensive management software to a number of industries, including the North Carolina Medicaid Developmental Disability industry. (Compl. ¶¶ 1, 9, ECF No. 1.)

22. Rodgers is a North Carolina resident involved in the I/DD industry. Aym entered an Independent Contractor Agreement with Rodgers effective April 1, 2009. (Compl. ¶¶ 10–12; Quinn Aff. Ex. 1.) Under that Agreement, Rodgers agreed to provide industry knowledge and refer potential software customers to Aym, and, after 2013, to assist Aym in identifying I/DD providers in North Carolina for Aym's potential acquisition. (Compl. ¶¶ 10–13; Quinn Aff. Ex. 1; Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 20, at 8–10, ECF No. 52.6.) Notwithstanding his work for Aym, Rodgers also "[did] mergers and acquisitions" for Providence Human Services

("Providence") from December 2011 to August 2015, (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 3, at 12, 18 [hereinafter "Rodgers Dep."], ECF No. 52.3), and assisted Hughes Behavioral Health ("Hughes") and HomeCare Management ("HCM") in the sale of those businesses in early 2015, (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. 3; Rodgers Dep. 34–36, 42, 64, 78, 83–84). Rodgers also became an independent contractor of CBC in September 2015 and an employee, officer, and director of CBC by November 17, 2015. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. 6; Rodgers Dep. 121; Quinn Aff. Ex. 5, at 2.)

23.    Throughout the first half of 2015, Dave Wittels ("Wittels") and Michael Somma ("Somma") were employees of Scopia. Wittels was a partner in the firm and the head of its private equity group; Somma was an analyst. (Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Exs. E, H, ECF Nos. 53.5, 53.8; Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Excerpts from Wittels Depo 14 [hereinafter "Pl.'s Excerpts from Wittels Dep."], ECF No. 53.19.) Wittels and Somma then became members of CBC's board of directors in the summer of 2015—from nearly the beginning of CBC's existence—with Wittels serving as the board chair. (Quinn Aff. Ex 5, at 2.)

24.    At the beginning of 2015, Wittels and Somma began conducting investment due diligence for Scopia as part of Scopia's strategy to explore potential acquisition opportunities in the North Carolina I/DD market for the firm's investors. (Pl.'s Excerpts from Wittels Dep. 8, 13–14; *see generally* Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Ex. C, ECF No. 53.3.) As part of their due diligence, Wittels and Somma traveled to North Carolina for numerous meetings in conjunction with their investigation of the

North Carolina I/DD market on six separate occasions in 2015: February 25, April 2, June 9, August 11, September 14, and October 14. (Pl.'s Excerpts from Wittels Dep. 86–90; Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Ex. C, at SC790–850.) The first three visits occurred before CBC was created on June 30, 2015, the last three came after. Wittels and Somma also made numerous phone calls and sent a number of emails—using their Scopia titles, email addresses, and signature blocks—to individuals and companies in North Carolina concerning the North Carolina I/DD market and the potential acquisition of those same targets. (*See generally* Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Ex. C.) Some of these calls and emails came before CBC was created and some came after.

26. During and as a result of their due diligence, Wittels and Somma began negotiations for the acquisition of HCM, a North Carolina-based company in the I/DD market. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Exs. 6, 7, ECF No. 52.4.) Rankin Whittington, as HCM's President, and Rodgers, in his individual capacity, signed non-disclosure agreements with Scopia on January 26, 2015 and January 22, 2015, respectively, in connection with these negotiations.[3] (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Exs. 4, 5, ECF No. 52.3.)

26. On March 18, 2015, HCM signed a non-binding "Term Sheet" with Scopia. (Pl.'s Suppl. Br. Resp. 12(b)(2) Mot. Ex. B [hereinafter "Term Sheet"], ECF No. 53.2.) The Term Sheet provided that Scopia would acquire HCM at a later date through an

---

[3] Each non-disclosure agreement contained New York choice-of-law and choice-of forum provisions.

entity created solely for the purposes of HCM's acquisition, which was later identified as CBC. (Term Sheet 1.) CBC closed its purchase of HCM on July 17, 2015. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 7, at 1.)

27. Soon thereafter, Aym's president, Lewis Quinn, approached Wittels and Somma about CBC's possible acquisition of Aym, with Quinn's retention as an executive officer of CBC after the purchase. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Exs. 13–19, ECF Nos. 52.5, 52.6.) Prior to exploring Quinn's overture, Scopia required Quinn, as Aym's CEO, to enter into a non-disclosure agreement containing New York choice-of-law and choice-of-forum provisions. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Exs. 11, 12, ECF No. 52.5.) During the following discussions, Quinn emailed a "vertical acquisition strategy" plan document to Wittels in New York on July 27, 2015. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 13.) Defendants' alleged misappropriation of this Aym document is a central issue in this action. Four days later, on July 31, 2015, Quinn provided Scopia and Scopia HCM their first notice that Rodgers had previously provided services for Aym. (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 8, at 105–13 [hereinafter "Scopia's Excerpts from Wittels Dep."], ECF No. 52.4.) Quinn broke off further discussions with Wittels about joining CBC on August 10, 2015 because he felt the "relationship [was] feeling a little too forced." (Scopia's Suppl. Mem. Supp. 12(b)(2) Mot. Ex. 17.)

28. CBC subsequently acquired Hughes in September 2015 and Lindley Habilitation Inc. ("Lindley") in 2016. Both companies, which were North Carolina companies operating in the North Carolina I/DD market, had originally been targeted

for acquisition by Aym prior to their acquisition by CBC. (Quinn Aff. ¶ 26, Exs. 5, 7, 10, 12.) Aym alleges that CBC's acquisitions of HCM, Hughes, and Lindley were not coincidences, and asserts that the Scopia Defendants' tortious conduct—i.e., misappropriation of trade secrets, conversion, tortious interference, and unfair or deceptive trade practices—led directly to these acquisitions.

B.    Conclusions of Law

29.    Although Plaintiff initially contended that Scopia and Scopia HCM were each subject to general and specific jurisdiction in this Court, Plaintiff abandoned this position as to Scopia at the hearing and now contends that Scopia is subject only to this Court's specific jurisdiction arising from Scopia's contacts with North Carolina and their relationship to Plaintiff's claims. Plaintiff continues to maintain that Scopia HCM is subject to both general and specific jurisdiction in this Court.

1.    General Jurisdiction over Scopia HCM

30.    To establish general jurisdiction over Scopia HCM, Plaintiff must show a "significantly higher" level of contacts with the forum state than for specific jurisdiction. *Cambridge Homes*, 194 N.C. App. at 412, 670 S.E.2d at 295. For general jurisdiction to extend to a foreign corporation, and, by extension, a foreign limited liability company, the United States Supreme Court has held that the corporation's contacts must be "so 'continuous and systematic' as to render [the corporation] essentially at home in the forum State." *Daimler*, 134 S. Ct. 746, 754 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). To that end, the Supreme Court has held that "[t]he place of incorporation and

principal place of business are paradigm bases for general jurisdiction [over a foreign corporation]," *id.* at 760 (quotation omitted), but acknowledged "the possibility that in an exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State," *id.* at 761 n.19.

31.    Plaintiff apparently contends such exceptional circumstances exist here, arguing that Scopia HCM is "at home" in this State because the company's stated purpose in its operating agreement is to do business in the State of North Carolina. The Court disagrees.

32.    As an initial matter, Plaintiff misstates Scopia HCM's business purpose as reflected in its operating agreement.  Rather than state that Scopia HCM will engage in business in North Carolina itself, the operating agreement provides as follows:

> The purpose of the Company is to serve as a fund through which the assets of its Members may be utilized in holding, trading and otherwise investing in a roll-up of private companies involving health care services in North Carolina (the "Underlying Investment") in which HomeCare Management Corporation serves as the platform company. The roll-up vehicle is called Community Based Care LLC.

(Operating Agreement Section 1.03.)

33.    The operating agreement therefore makes clear that Scopia HCM was created to serve as a fund with a controlling ownership interest in CBC and expressly contemplates that CBC, not Scopia HCM, would own HCM and other companies CBC might acquire in the North Carolina I/DD market.  As such, the operating agreement reflects a straightforward parent/subsidiary relationship, and our courts have long recognized that "[w]hen a subsidiary of a foreign corporation is carrying on business

in a particular jurisdiction, the parent is not automatically subject to jurisdiction in [that] state." *Ash v. Burnham Corp.*, 80 N.C App. 459, 462, 343 S.E.2d 2, 4 (1986). So long as "the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary." *Id.* There must be a showing that "the businesses are parts of the same whole." *Wyatt v. Walt Disney World, Co.*, 151 N.C. App. 158, 168, 565 S.E.2d 705, 711 (2002). Plaintiff has not brought forward any evidence that even begins to approach this standard.

34. Moreover, courts around the country have been reluctant to find "exceptional circumstances" to the *Daimler* paradigm for general jurisdiction, including the Supreme Court most recently in *BNSF Railway Co. v. Tyrrell*, 137 S. Ct. 1549 (2017). *See also id.* at 1561–62 (Sotomayor, J., dissenting). Many courts applying the *Daimler* standard to limited liability companies have been similarly disinclined. *See, e.g.*, *Miller v. Native Link Constr., LLC*, No. 15-1605, 2017 U.S. Dist. LEXIS 131021, at *87 (W.D. Pa. Aug. 17, 2017) ("Under the rule of *Daimler* as it has been applied to limited liability companies, [a defendant] will only be subjected to general jurisdiction in the state of its organization and principal place of business."); *Marco Int'l, LLC v. Como-Coffee, LLC*, No. 17-CV-10502, 2017 U.S. Dist. LEXIS 91934, at *19 n.3 (E.D. Mich. June 15, 2017*)* (same); *Bradford v. Telerecovery*, No. 16-2933, 2017 U.S. Dist. LEXIS 91324, at *10 n.67 (E.D. La. June 14, 2017) ("It is incredibly difficult to establish general jurisdiction [over a limited liability company]

in a forum other than the place of incorporation or principal place of business."); *Magna Powertrain de Mex. S.A. de C.V. v. Momentive Performance Materials USA LLC*, 192 F. Supp. 3d 824, 828 (E.D. Mich. 2016) ("[I]n *Daimler* the Supreme Court held that corporations[—]and by extension limited liability companies[—]are 'at home' only in their place of incorporation or principal place of business[.]").

35.     Similarly, based on the Court's research, this Court and the North Carolina appellate courts have yet to find a sufficiently "exceptional case" after *Daimler* to extend general jurisdiction to a corporation or a limited liability company in North Carolina that has neither organized itself in this State nor located its principal place of business here. Such an "exceptional case" is clearly not presented on the current record. Scopia HCM is a Delaware limited liability company with its principal place of business in New York. The evidence shows that Scopia HCM has no offices, employees, or property in North Carolina and conducts no regular business in North Carolina. Scopia HCM simply owns a North Carolina entity, CBC, that engages in substantial activity in North Carolina. Plaintiff has not pleaded an alter ego theory of liability and has not advanced veil piercing allegations, either in its Complaint or in opposition to the 12(b)(2) Motion. *See State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 188 N.C. App. 302, 306, 655 S.E.2d 446, 449 (2008) (holding that plaintiff's conclusory allegations were insufficient to establish an alter ego theory of jurisdiction).

36. Based on these considerations, the Court concludes that Plaintiff has failed to meet its burden to show that the Court may exercise general jurisdiction over Scopia HCM.

2. Specific Jurisdiction over Scopia and Scopia HCM

37. Plaintiff argues that Defendants Scopia and Scopia HCM, each acting through Wittels, Somma, and Rodgers, engaged in conduct in North Carolina that gives rise to each of Plaintiff's claims, and thus that specific jurisdiction is properly exercised over each Scopia Defendant.[4] In evaluating whether specific jurisdiction exists over Scopia and Scopia HCM, it is important to determine the capacities in which Wittels, Somma, and Rodgers took the actions on which Plaintiff bases its claims.

38. Plaintiff alleges that Aym provided Rodgers with copies of its strategic plan in 2013, which reflected HCM as an initial acquisition target, and that as of December 2014, Rodgers was actively assisting Aym in a possible purchase of HCM. (Compl. ¶¶ 12–14.) At that same time, however, Plaintiff contends that Rodgers disclosed Aym's confidential trade secret information to Scopia and that thereafter Scopia used that information to enable CBC's successful efforts to purchase HCM, Hughes, and Lindley in North Carolina. (Compl. ¶¶ 13, 16, 19, 22, 25.) All of Plaintiff's claims

---

[4] As with general jurisdiction, Plaintiff does not advance an alter ego theory of liability to support specific jurisdiction over either Scopia Defendant. Even if it had done so, North Carolina courts will disregard the corporate form only in "an extreme case where necessary to serve the ends of justice." *State ex rel. Cooper v. W. Sky Fin., LLC*, 2015 NCBC LEXIS 87, at *15 (N.C. Super. Ct. Aug. 27, 2015).

against Scopia and Scopia HCM are premised on this alleged conduct. (Compl. ¶¶ 30–56.)

39.     Plaintiff contends that Wittels, Somma, and Rodgers were acting on behalf of Scopia and Scopia HCM at all relevant times. The Scopia Defendants assert that Rodgers never acted on behalf of either of them at any time and that Wittels and Somma always acted on behalf of CBC.

40.     The evidence presented shows that although Wittels and Somma began exploring the North Carolina I/DD market for possible acquisition targets in late 2014, CBC was not formed until June 30, 2015. Almost immediately, Wittels and Somma became CBC directors, and CBC thereafter acquired HCM on July 17, 2015, Hughes in September 2015, and Lindley in 2016. The evidence shows that all acquisition activities by Wittels, Somma, and Rodgers after CBC's creation were undertaken on behalf of CBC and not on behalf of either of the Scopia Defendants.

41.     As a result, the Court concludes that the alleged conduct of Wittels, Somma, and Rodgers after CBC's creation on June 30, 2015 was on behalf of CBC and is therefore not relevant to the Court's analysis concerning specific jurisdiction over the Scopia Defendants. The Court thus examines whether specific jurisdiction exists over either Scopia Defendant based on the alleged conduct of Wittels, Somma, and Rodgers occurring prior to CBC's formation on June 30, 2015.

42.     To assert specific jurisdiction, the Court must "focus . . . upon the relationship among the defendant, this State, and the cause of action." *Tom Togs*, 318 N.C. at 366, 348 S.E.2d at 786. "Specific jurisdiction exists when the cause of

action arises from or is related to defendant's contacts with the forum." *Skinner*, 361 N.C. at 122, 638 S.E.2d at 210. "What constitutes minimum contacts depends on the quality and nature of the defendant's contacts on a case-by-case basis, but, regardless of the circumstances, there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Dailey v. Popma*, 191 N.C. App. 64, 70, 662 S.E.2d 12, 16–17 (quotation marks and citation omitted). "The defendant's contact with the forum state must be 'such that he should reasonably anticipate being haled into court there.'" *Id.* at 70, 662 S.E.2d at 17 (quoting *Tom Togs*, 318 N.C. at 365, 348 S.E.2d at 786).

43. Turning first to Scopia, the evidence shows that Wittels, an officer and employee of Scopia, and Somma, an employee of Scopia, began investment due diligence in early 2015 to locate investment opportunities for Scopia's clients in the North Carolina I/DD market. The pair traveled to North Carolina on three separate occasions between February 2015 and CBC's formation in June 2015 to investigate investment opportunities that Scopia intended to pursue in the North Carolina I/DD industry through what became CBC. In the course of their due diligence in the first half of 2015, Wittels and Somma, acting for Scopia, initiated contact with Rodgers and HCM's Whittington in North Carolina and obtained non-disclosure agreements from each of them for Scopia's potential acquisition of HCM in North Carolina. Thereafter, Wittels, again acting for Scopia, executed a term sheet with HCM on behalf of Scopia which contemplated HCM's eventual purchase by Scopia's later created entity.

44.    During this same time, Wittels and Somma made numerous telephone calls to persons in North Carolina concerning the North Carolina I/DD market and the potential acquisition of HCM. They also sent a number of emails to North Carolina individuals and companies concerning these same matters. The evidence presented shows that all of Wittels's and Somma's pre-June 30, 2015 conduct in or directed to North Carolina was on behalf of Scopia and in furtherance of Scopia's strategy to create an investment vehicle by which the firm's clients could invest in the North Carolina I/DD market and to identify investment opportunities for the to-be-created entity to pursue.

45.    The Court concludes that the quantity of these pre-June 30, 2015 contacts and their nature and quality weigh in favor of finding minimum contacts under North Carolina law.[5] In particular, Scopia's initiation of significant dispute-related contacts with North Carolina, *see, e.g.*, *Church v. Carter*, 94 N.C. App. 286, 292, 380 S.E.2d 167, 171 (1989) (finding non-resident defendant's initiation of North Carolina contacts supported jurisdiction), its multiple trips to this State in pursuit of HCM and other potential acquisition targets, *see, e.g.*, *Walden*, 134 S. Ct. at 1122 ("physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact"), and its regular and

---

[5] Plaintiff also seeks to impute Rodgers's pre-June 30, 2015 activities to the Scopia Defendants, but the Court concludes that Plaintiff has failed to offer persuasive evidence that Rodgers was an agent of either Scopia Defendant during the relevant period. It is undisputed that Rodgers never entered an agreement with, or received any compensation from, Scopia or Scopia HCM at any time, that he worked full-time "doing mergers and acquisitions" work for Providence Human Services, and that he assisted Hughes in its potential sale during the first six months of 2015. Thus, the Court concludes that Rodgers's contacts with North Carolina do not require or favor the assertion of jurisdiction over the Scopia Defendants.

frequent initiation of communications into the State concerning the I/DD market in North Carolina and the HCM and Hughes acquisitions in particular, *see, e.g.*, *Brown v. Ellis*, 363 N.C. 360, 361–64, 678 S.E.2d 222, 222–24 (2009) (finding jurisdiction based on defendant's initiation of telephone calls and emails to plaintiff in North Carolina), all of which was directed and conducted by Scopia personnel in furtherance of Scopia's North Carolina-focused investment strategy and occurred before CBC's creation, *see Brickman v. Codella*, 83 N.C. App. 377, 384, 350 S.E.2d 164, 168 (1986) (finding jurisdiction over defendant where the contacts were purposefully directed toward the forum state in order to obtain financial assistance with a new business venture for defendant's commercial benefit), are factors our courts have recognized will support minimum contacts for the exercise of specific jurisdiction.

46.     Moreover, the close connection between Plaintiff's claims and Scopia's pre-June 30, 2015 contacts with North Carolina favor a finding of sufficient minimum contacts here. In particular, Plaintiff alleges that Scopia misappropriated Aym's trade secret information beginning in late 2014, used that information to identify and secure HCM as an acquisition target, and, using that information, took steps in North Carolina to enable the later-created CBC to acquire HCM, Hughes, and Lindley—all of which were North Carolina-based companies on Aym's confidential target list. *See, e.g.*, *Dow Chemical Co. v. Organik Kimya Holding A.S.*, No. 12090-VCG, 2017 Del. Ch. LEXIS 776, at *18–28 (Del. Ch. Oct. 19, 2017) (finding personal jurisdiction in state where defendant formed a subsidiary when defendant allegedly acquired plaintiff's trade secrets then formed the new entity to use those trade secrets in

competition with plaintiff). Scopia's pre-June 30, 2015 contacts with North Carolina—which were largely focused on identifying, contracting with, and arranging the acquisition of HCM and Hughes—comprise a significant part of the conduct that Plaintiff alleges gave rise to its injuries and each claim asserted in the Complaint.

47. Although the evidence appears to show that Plaintiff's allegedly confidential business plan was not provided to Scopia until late July 2015, the Complaint alleges that other trade secret information, including Aym's target acquisition list, acquisition plans and tactics, and negotiation strategies, was misappropriated as early as December 2014 and used by Scopia to pursue HCM and Hughes in North Carolina in early 2015. (Compl. ¶¶ 17, 18, 23, 25, 31, 49.) As such, the Court concludes that Plaintiff's causes of action arise from or are related to Scopia's contacts with the North Carolina forum.[6]

48. Scopia puts great weight on the New York choice-of-law and forum selection clauses contained in the non-disclosure agreements executed by Rodgers and Whittington, the non-disclosure agreement executed by Aym's president Quinn, and the asset purchase agreement executed by CBC and HCM, contending that all four agreements show that Scopia has not "purposely availed" itself of the laws of this State. Aym, however, is not a party to any of these agreements and has not alleged a breach of those agreements in this action, limiting their persuasive effect—particularly here, where Scopia is alleged to have engaged in unlawful, tortious,

---

[6] The facts allegedly giving rise to the misappropriation claim are the same as those allegedly giving rise to each of Plaintiff's other claims: conversion, unfair or deceptive trade practices, and tortious interference with prospective economic advantage.

extra-contractual conduct in this State. Scopia also advances numerous merits-based arguments suggesting that Plaintiff's claims against it should be dismissed, but which the Court finds are of limited relevance to the current Motion.

49. Accordingly, the Court concludes that Plaintiff has shown by a preponderance of the evidence that Scopia "purposefully avail[ed] itself of the privilege of conducting activities within [this State]," *Dailey*, 191 N.C. App. at 70, 662 S.E.2d at 16–17, and had sufficient dispute-related contacts with North Carolina such that it could have "reasonably anticipate[d] being haled into court [in this State]" to defend against the asserted claims, *id.* at 70, 662 S.E.2d at 17.

50. Having determined that Scopia purposefully established dispute-related minimum contacts in North Carolina, the Court next must determine whether the exercise of jurisdiction over Scopia would offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. Relevant considerations include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *Burger King*, 471 U.S. at 477 (quotation marks omitted). Where minimum contacts have been found, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.*

51. Scopia fails to carry that burden here. Not only does Plaintiff have a strong interest in litigating this matter in its home state, North Carolina has a strong

interest in providing a forum for its injured residents. *See, e.g.*, *Baker v. Lanier Marine Liquidators, Inc.*, 187 N.C. App. 711, 716, 654 S.E.2d 41, 45 (2007) ("[A] state has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."). Further, there is no evidence in the record to indicate that it would be more convenient for the parties to litigate the present matter in a different forum, that a different forum would facilitate a more efficient resolution, or that defendant will suffer undue burden from litigating this case in North Carolina. Indeed, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the . . . defendant." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987); *see, e.g.*, *Cherry Bekaert & Holland v. Brown*, 99 N.C. App. 626, 635, 394 S.E.2d 651, 657 (1990) ("Litigation on interstate business transactions inevitably involves inconvenience to one of the parties.").

52.     In sum, the Court concludes, based on the evidence of record, that Scopia has sufficient minimum contacts with North Carolina to warrant the exercise of personal jurisdiction. Although Scopia's contacts with North Carolina are limited in time, they are extensive and directly connected to the causes of action recited in Plaintiff's Complaint. By engaging in the conduct described above, the Court concludes that Scopia purposefully availed itself of "the privilege of conducting activities" in North Carolina. *Cambridge Homes*, 194 N.C. App. at 413, 670 S.E.2d at 296; *see also Centura Bank v. Pee Dee Express, Inc.*, 119 N.C. App. 210, 213, 458 S.E.2d 15, 18 (1995). Having weighed all of the factors "in light of fundamental

fairness and the circumstances of the case," the Court concludes that the exercise of personal jurisdiction over Scopia comports with traditional notions of fair play and substantial justice. *B.F. Goodrich Co. v. Tire King of Greensboro, Inc.*, 80 N.C. App. 129, 132, 341 S.E.2d 65, 67 (1986). The Court therefore denies Scopia's 12(b)(2) Motion.

53.     Turning next to Scopia HCM, Plaintiff again contends, as it did in arguing for the assertion of general jurisdiction, that Scopia HCM is subject to this Court's specific jurisdiction because it owns CBC and serves as a fund through which its members' assets may be utilized in CBC's business activities in North Carolina. The only additional evidence Plaintiff advances to support specific jurisdiction over Scopia HCM is Scopia HCM's reimbursement of Wittels and Somma for trips they took to North Carolina between February 25, 2015 and September 7, 2016 as part of their duties for Scopia, and later, CBC. Such evidence is not sufficient to establish minimum contacts under prevailing case law. As a result, the Court concludes that Plaintiff has failed to meet its burden to show that specific jurisdiction may be properly exercised over Scopia HCM. Accordingly, Plaintiff's claims against Scopia HCM should be dismissed for lack of personal jurisdiction.

III.

SCOPIA DEFENDANTS' 12(b)(5) MOTION

54.     The Scopia Defendants contend in their 12(b)(5) Motion that Plaintiff's service violated due process because it did not comply with North Carolina's long-arm statute. Rule 4 of the North Carolina Rules of Civil Procedure states that in order to

exercise proper service for any action, the court must have "grounds for personal jurisdiction as provided in [North Carolina's long-arm statute]." N.C. R. Civ. P. 4(j). As discussed above, the "North Carolina legislature designed the long-arm statute to extend personal jurisdiction to the limits permitted by due process." *Lang v. Lang*, 157 N.C. App. 703, 708, 579 S.E.2d 919, 922 (2003).

55. Accordingly, the Court grants in part and denies in part the 12(b)(5) Motion consistent with its rulings on the 12(b)(2) Motion as described above. *See Ga. R.R. Bank & Tr. Co. v. Eways*, 46 N.C. App. 466, 468, 265 S.E.2d 637, 640 (1980) (where subject matter jurisdiction exists and process was properly served under Rule 4, the analysis "becomes limited to the question of whether the assertion of jurisdiction over the [defendant] . . . violates the principles of due process").

IV.

DEFENDANTS' 12(b)(6) MOTIONS TO DISMISS[7]

A.    Legal Standard

56. In ruling on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*,

---

[7] In light of the Court's conclusion that Plaintiff's claims against Scopia HCM should be dismissed for lack of personal jurisdiction, the Court does not consider Scopia HCM's Motion to Dismiss under Rule 12(b)(6). For clarity, the Court will identify Scopia, CBC, and Rodgers, collectively, hereafter as "the 12(b)(6) Movants."

85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citing *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979)).

57.     The Court will not grant a motion to dismiss "unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted). Therefore, dismissal of a claim pursuant to Rule 12(b)(6) is only proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

58.     The Court construes the allegations in the pleading "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 802 S.E.2d 888, 891 (N.C. 2017). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005); *see also McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013). The Court may also reject allegations "that are contradicted by the documents attached, specifically

referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

B. Allegations in the Complaint

59. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) but only recites those allegations in the Complaint that are relevant and necessary to the Court's determination of the Motions.

60. Aym provides comprehensive management software to various industries, including the I/DD industry. (Compl. ¶ 9.)

61. In April 2009, Rodgers and Aym entered into an Independent Contractor Agreement, which prevented Rodgers from disclosing Aym's trade secrets or confidential information. (Compl. ¶¶ 10–11, 27.)

62. Aym "drafted a strategic plan to vertically integrate itself into th[e] market through the acquisition of [I/DD] providers" (the "Plan") and decided to allow Rodgers to assist with the identification of potential I/DD providers for acquisition. (Compl. ¶ 12.) "A critical part of the [Plan] was that the first acquisition should be a 'platform' or foundational provider which had a relatively large market, had licenses to cover every payor in North Carolina, was financially stable with a good management team, and was an existing customer of Aym." (Compl. ¶ 14.)

63. According to Plaintiff, through his work with Aym, Rodgers had access to "trade secret and confidential commercial information regarding Aym's business, its relationships with its customers, the customers' strengths and weaknesses, and Aym's [Plan][.]" (Compl. ¶ 15.) Aym protected the Plan and related trade secrets "by

limiting access to a very small number of people within its organization on a need to know basis" and by binding its only agent, Rodgers, to a confidentiality agreement. (Compl. ¶ 18.) Aym also took steps to maintain the secrecy of this information through physical security and computer password protection. (Compl. ¶ 33.)

64. In 2013, Aym attempted to acquire HCM as its platform provider but was unsuccessful. (Compl. ¶ 14.) In late 2014, Aym, with Rodgers's involvement, again attempted to acquire HCM. (Compl. ¶ 16.)

65. On February 18, 2015, Aym delivered to HCM a letter of intent to purchase. (Compl. ¶ 19.) Aym delivered a final, revised letter of intent on March 13, 2015. (Compl. ¶ 19.) HCM subsequently informed Aym that it had agreed to an acquisition by Scopia. (Compl. ¶ 19.)

66. Aym informed Rodgers that Lindley was also an Aym acquisition target, and Rodgers, on behalf of Aym, contacted Lindley in 2014 to negotiate an acquisition. (Compl. ¶ 24.) The acquisition discussions, however, were unsuccessful. (Compl. ¶ 24.)

67. Plaintiff alleges that Rodgers began working with Scopia at least by December 2014, but that Rodgers did not advise Aym of his work with Scopia until July 2015. (Compl. ¶¶ 19–20.)

68. After being informed of Rodgers's work for Scopia, Aym alleges that it informed Scopia that Rodgers was "privy to its proprietary trade secrets" and "had participated on Aym's behalf in the negotiations with HCM." (Compl. ¶ 21.) Aym alleges that "[w]hile still under his obligations to Aym, Rodgers conspired with Scopia

and Scopia HCM to deliver to them information that is confidential, proprietary, and constitutes a trade secret of Aym." (Compl. ¶ 23.) As a result, Plaintiff alleges Scopia and Scopia HCM were able to purchase HCM and Hughes. (Compl. ¶ 22.)

69. Additionally, after being informed of Rodgers's work for Scopia, Aym alleges that it contacted Lindley, again to express interest in an acquisition, and was informed by Lindley that it would advise Aym if Lindley decided to sell. (Compl. ¶ 24.) In 2016, Lindley contacted Aym, and they began negotiations. (Compl. ¶ 25.) Soon thereafter, however, Aym learned that Lindley had been purchased by CBC, allegedly with Rodgers's assistance. (Compl. ¶ 25.)

70. Plaintiff pleads that "[b]ut for Defendants' misappropriation of Plaintiff's trade secrets, confidential information, and other material information of commercial value and use thereof for competitive advantage, Plaintiff would have had a higher probability of securing purchases of [I/DD] providers in situations where it competed with Defendants." (Compl. ¶ 49.)

C.    Analysis

71. Because Scopia, CBC, and Rodgers move to dismiss the claims in the Complaint on similar grounds, the Court considers the Motions together.

1. Misappropriation of Trade Secrets

72. The 12(b)(6) Movants contend that the claim for misappropriation of trade secrets must be dismissed because Plaintiff has not alleged its trade secrets with requisite particularity.

73. North Carolina's Trade Secret Protection Act provides that the owner of a trade secret "shall have a remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153. A trade secret is one that must "[d]erive[] independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use" and must be the subject of reasonable efforts to maintain its secrecy. N.C. Gen. Stat. § 66-152(3).

74. To survive a motion to dismiss, a plaintiff's complaint "must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *VisionAir, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004). Therefore, "a complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is insufficient to state a claim for misappropriation of trade secrets." *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 327, 660 S.E.2d 577, 585–86 (2008) (quotation marks omitted) (affirming dismissal of misappropriation of trade secrets counterclaims where the "allegations [did] not identify with sufficient specificity either the trade secrets Plaintiffs allegedly misappropriated or the acts by which the alleged misappropriations were accomplished").

75. The most consequential of the alleged trade secrets that Plaintiff contends the 12(b)(6) Movants misappropriated was Aym's "strategic plan to vertically

integrate itself," (i.e., the Plan), copies of which Plaintiff alleges it provided to Rodgers. (Compl. ¶ 12.) The Plan allegedly included "a list of Aym's proposed acquisition targets," (Compl. ¶ 13), and discussed Aym's confidential strategy, including its decision that "the first acquisition should be a 'platform' or foundational provider which had a relatively large market, had licenses to cover every payor in North Carolina, was financially stable with a good management team, and was an existing customer of Aym," (Compl. ¶ 14). Plaintiff's allegations reference a specific confidential document, specifically describe its contents, and identify with particularity the misappropriated information that Plaintiff contends is proprietary and confidential.

76. Moreover, the information sought to be protected is of the sort our courts have regularly concluded satisfies the pleading standard under Rule 12(b)(6) in misappropriation of trade secret cases. *See, e.g.*, *State ex rel. Utils. Comm'n v. MCI Telecomms., Corp.*, 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999) (concluding that a "compilation of information" involving customer data and business operations which has "actual or potential commercial value from not being generally known" is sufficient to constitute a trade secret under TSPA); *New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *7, 35–36 (N.C. Super. Ct. Aug. 18, 2017) (denying motion to dismiss where complaint alleged trade secret was "a blueprint for the acquisition of a [certain] business [that] incorporate[d] confidential and proprietary strategies that the [plaintiffs] ha[d] developed over time for acquiring such businesses, which [were] not generally known to others"); *Bldg. Ctr., Inc. v.*

*Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at * 10–12 (N.C. Super. Ct. Oct. 21, 2016) (denying 12(b)(6) motion where complaint identified trade secrets as "confidential and proprietary business information" that included "names and contacts of customers; [and] customer preferences, including the needs, requirements, and values of [the plaintiff's] customers"); *see also, e.g.*, *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015) (finding "confidential '2015 strategy' document" to constitute trade secret under North Carolina law).

77. Accordingly, the Court concludes that Plaintiff has sufficiently identified the Plan as a trade secret "to enable [the 12(b)(6) Movants] to delineate that which [they are] accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *See VisionAir, Inc.*, 167 N.C. App. at 510–11, 606 S.E.2d at 364.

78. In contrast, however, Plaintiff pleads the misappropriation of its remaining alleged trade secrets using broad, vague generalities that fail to pass muster under Rule 12(b)(6). In particular, Plaintiff's reliance on terms such as "negotiation strategies," "information gained illicitly," "information that is confidential, proprietary, and constitutes a trade secret," "strategy for the purchase," "specific tactics on the HCM purchase," "current negotiating stances," "material information of commercial value," and "related trade secrets," (Compl. ¶¶ 17, 18, 23, 25, 31, 49), does not offer the particularity our courts have required to survive a motion to dismiss under Rule 12, *see, e.g.*, *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 586 (upholding dismissal of a trade secrets claim where the allegations identified the trade secrets

as "business methods; clients, their specific requirements and needs; and other confidential information pertaining to [the claimant's] business," as well as "confidential client information and confidential business information"); *Krawiec v. Manly*, 2016 NCBC LEXIS 7, at *25–26 (N.C. Super. Ct. Jan. 22, 2016) (finding "original ideas and concepts" that include "marketing strategies and tactics [and] student, client and customer lists and their contact information" to be too non-specific and generalized to survive 12(b)(6) dismissal); *AECOM Tech. Corp. v. Keating*, 2012 NCBC LEXIS 9, at *8 (N.C. Super. Ct. Feb. 6, 2012) ("confidential commercial information" including "customer lists, customer contract information, pricing information, and product information" insufficient under Rule 12(b)(6)).

79. Scopia and CBC also argue that Plaintiff's failure to allege any efforts to maintain the secrecy of its purported trade secrets, other than requiring those with access to the Plan to sign confidentiality agreements, defeats Plaintiff's claim. The Court disagrees.

80. First, "only where efforts to maintain [the] secrecy of the allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the 12(b)(6) stage." *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *14. Moreover, here, Plaintiff has alleged that it imposed a variety of measures to assure the Plan's confidentiality, including "physical security, computer password protection, and limited access to the information on a need to know basis[,]" (Compl. ¶ 33), distribution "to a very small number of people within [Aym's] organization[,]" (Compl. ¶ 18), and binding its "only agent, Rodgers . . . to confidentiality" under an

Independent Contractor Agreement, (Compl. ¶¶ 10, 18). The Court concludes that these allegations satisfy the requirements of Rule 12(b)(6). *See, e.g.*, *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *13–15 (finding "reasonable efforts" under Rule 12(b)(6) where plaintiff pleaded "security measures, including but not limited to password-protected login, controlled and permission-restricted access on a need-to-know basis, and confidentiality policies and/or agreements"); *New Friendship Used Clothing Collection, LLC*, 2017 NCBC LEXIS 72, at *36–37 (sufficient efforts to maintain security involved password-protected computer drives and non-disclosure agreements).

81. Finally, the 12(b)(6) Movants assert that Plaintiff's claim should be dismissed because the alleged trade secrets lack commercial value, contending that "Plaintiff's strategic plan to increase its own profits through vertical integration has little value to anyone outside Plaintiff's own organization." (Corp. Defs.' Mem. Supp. 12(b)(6) Mot. 7, ECF No. 13 (emphasis omitted).) The 12(b)(6) Movants ignore, however, that Plaintiff has alleged that the Plan has commercial value to competitors, including Scopia, who could use or adopt elements of the Plan in advancing their own business interests at Aym's expense. (*See* Compl. ¶¶ 12–14, 22, 32.)

82. Accordingly, the Court concludes that the 12(b)(6) Movants' Motions to Dismiss Plaintiff's trade secret misappropriation claim should be granted and the claim dismissed except to the extent Plaintiff alleges misappropriation of the Plan.[8]

---

[8] The Court notes that evidence advanced on the 12(b)(2) Motions raises serious questions concerning the ultimate viability of Plaintiff's misappropriation claim against the 12(b)(6) Movants. However, the Court cannot, and does not, consider that evidence on the 12(b)(6) Motions, confining itself instead, as it must, to allegations in the Complaint and "the

## 2. Conversion

83. The 12(b)(6) Movants contend that Plaintiff's claim for conversion must fail because (i) the Complaint does not allege that Plaintiff has been denied complete domination and control over its property and (ii) the allegedly converted property is not subject to a conversion claim.

84. Under North Carolina law, "[t]he tort of conversion is well defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quotation marks omitted) (quoting *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). The Court of Appeals has emphasized that "[t]he essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner[.]" *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008) (quoting *Lake Mary L.P. v. Johnston,* 145 N.C. App. 525, 532, 551 S.E.2d 546, 552, *rev. denied*, 354 N.C. 363, 557 S.E.2d 539 (2001)). In short, "there is no conversion until some act is done which is a denial or violation of the plaintiff's domination over or rights in the property." *Mace v. Pyatt*, 203 N.C. App. 245, 256, 691 S.E.2d 81, 90 (2010) (quoting *Lake Mary L.P.*, 145 N.C. App. at 532, 551 S.E.2d at 552).

---

documents attached, specifically referred to, or incorporated by reference [therein]." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862.

85. Plaintiff recognizes that the 12(b)(6) Movants "did not 'completely deprive' Plaintiff of access to the strategic plan[,]" which is in "electronic format[,]" but argues that this Court should follow the approach of two recent federal decisions—*Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-CV-00228-FDW-DSC, 2013 U.S. Dist. LEXIS 15372 (W.D.N.C. Feb. 5, 2013) and *Springs v. Mayer Brown, LLP*, 3:09cv352, 2012 U.S. Dist. LEXIS 9734 (W.D.N.C. Jan. 27, 2012)—in permitting claims for the alleged conversion of electronically-stored information to survive 12(b)(6) dismissal. (Pl.'s Resp. Corp. Defs.' 12(b)(6) Mot. 11–13, ECF No. 33.)

86. This Court, however, has repeatedly held that under North Carolina law, as articulated by the North Carolina appellate courts, "making a copy of electronically-stored information[,] which does not deprive the plaintiff of possession or use of information, does not support a claim for conversion." *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at \*53 (N.C. Super. Ct. June 20, 2016); *see also Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at \*18 (N.C. Super. Ct. June 9, 2017); *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at \*55 (N.C. Super Ct. Feb. 18, 2016); *Horner Int'l Co. v. McKoy*, 2014 NCBC LEXIS 68, at \*8–9 (N.C. Super. Ct. Dec. 18, 2014). Because Plaintiff fails to allege that it has been deprived of possession or use of its property, the Court concludes that Plaintiff's conversion claim must be dismissed against the moving Defendants.

### 3. Unfair or Deceptive Trade Practices

87. To successfully state a claim for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, a plaintiff must allege "(1) an unfair or deceptive act or

practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593, 619 S.E.2d 577, 582 (2005) (quoting *Spartan Leasing v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991)). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive. The determination as to whether an act is unfair or deceptive is a question of law for the court . . . [and] some type of egregious or aggravating circumstances must be alleged[.]" *Dalton v. Camp*, 353 N.C. 647, 656–57, 548 S.E.2d 704, 711 (2001) (internal citations and quotations omitted).

88.     Here, Plaintiff alleges that Rodgers "cooperated" and "conspired" with the Corporate Defendants in violation of section 75-1.1 to deliver to the Corporate Defendants Aym's confidential and protected information, including the Plan and Aym's specific tactics and negotiating strategy, to assist the Corporate Defendants in CBC's acquisition of HCM, Hughes, and Lindley.  (Compl. ¶¶ 17, 23.)

89.     Plaintiff's Chapter 75 allegations against Rodgers stem from his alleged breach of the non-disclosure provision contained in his Independent Contractor Agreement with Aym.  "It is well recognized that actions for unfair or deceptive trade practices are distinct from actions for breach of contract." *McKinnon v. CV Indus.*, 213 N.C. App. 328, 340, 713 S.E.2d 495, 504 (2011). Consequently, our courts have long recognized that "[a] mere breach of contract, even if intentional, is not an unfair or deceptive act under Chapter 75" unless there are "substantial aggravating circumstances attending the breach of contract."  *Bob Timberlake Collection, Inc. v.*

*Edwards*, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006). Aggravating circumstances are most often found in the formation of the contract; "[i]t is far more difficult to allege and prove egregious circumstances *after* the formation of the contract." *Post v. Avita Drugs, LLC*, 2017 NCBC LEXIS 95, at *10 (N.C. Super. Ct. Oct. 11, 2017); *see, e.g.*, *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 624 (2001) ("A violation of Chapter 75 is unlikely to occur during the course of contractual performance, as these types of claims are best resolved by simply determining whether the parties properly fulfilled their contractual duties.").

90. Here, Plaintiff alleges that long after Rodgers entered the Independent Contractor Agreement with Aym, Rodgers breached the Agreement's non-disclosure provision by disclosing Aym's confidential and trade secret information to the Corporate Defendants without notice to Aym. (Compl. ¶ 43.) Plaintiff argues that Rodgers's deception, i.e., disclosing Aym's trade secrets without advising Aym, constitutes the aggravating circumstances necessary to permit Plaintiff's Chapter 75 claim to survive. The Court disagrees.

91. As an initial matter, Plaintiff does not allege that Rodgers had any affirmative disclosure obligations under the Independent Contractor Agreement or identify any source for his purported duty to disclose on the facts here. Further, Rodgers's mere failure to inform Aym of his conduct allegedly in breach of their contract does not constitute substantial aggravating circumstances. *See, e.g.*, *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 781 S.E.2d 889, 893 (N.C. Ct. App. 2016) (no aggravating circumstances where alleged deception based on failure

to disclose contract violations). Moreover, and more importantly, the purported deception is of no consequence without Rodgers's purported breach of contract. The gravamen of Plaintiff's claim is the disclosure and use of its allegedly confidential information and trade secrets, not Rodgers's alleged deception.

92. In short, Plaintiff has failed to plead the existence of substantial aggravating circumstances capable of sustaining a claim for unfair or deceptive trade practices that are "identifiable" and "distinct from" Rodgers's alleged breach of contract. *See, e.g.*, *Broadnax v. Associated Cab & Transp., Inc.*, 2016 NCBC LEXIS 29, at *10 (N.C. Super. Ct. Apr. 12, 2016) ("Ultimately, where the 'heart of [a plaintiff's] allegation [concerns] the performance of the contract,' the tort claim will be barred." (quoting *Mecklenburg Cnty. v. Nortel*, No. 3:07-cv-00320-GCM, 2008 U.S. Dist. LEXIS 110381, at *12–13 (W.D.N.C. 2008) (applying North Carolina law))); *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *11–12 (N.C. Super. Ct. Jan. 5, 2016) (dismissing plaintiff's 75-1.1 claim where "[defendant] did not owe [plaintiff] a separate and distinct duty not to provide deceptive and misleading information" because the claims were "at bottom, a simple breach of contract claim"); *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 739, 659 S.E.2d 483, 488 (2008) (dismissing 75-1.1 claim where plaintiff "at most" alleged breach of a confidentiality agreement). Consequently, the Court concludes that Plaintiff's Chapter 75 claim against Rodgers should be dismissed with prejudice.

93. As to Scopia and CBC, Plaintiff alleges that they engaged in a "conspiracy" with Rodgers to use Aym's confidential information, (*see* Pl.'s Resp. Corp. Defs.'

12(b)(6) Mot. 14–15), and, further, that Scopia's actions amounted to "an inequitable assertion of [its] power and position," (Compl. ¶ 43). Neither contention, however, standing apart from the Plan, can sustain Plaintiff's Chapter 75 claim against these Defendants, even at this initial pleading stage.

94. First, apart from its allegations concerning the disclosure and use of the Plan, Plaintiff's Complaint contains broad allegations of Scopia's and CBC's disclosure and use of Plaintiff's allegedly confidential information, but that information is described in only vague, general, conclusory, and nonspecific terms. North Carolina's rules of pleading require more to survive a challenge under Rule 12(b)(6). *See, e.g.*, *Estate of Vaughn v. Pike Elec., LLC*, 230 N.C. App. 485, 493, 751 S.E.2d 227, 233 (2013) (in considering a Rule 12(b)(6) motion, "the court is not . . . required to accept mere conclusory allegations, unwarranted deductions of fact, or unreasonable inferences as true").

95. Similarly, Plaintiff's assertion that Scopia inequitably asserted its market power and position is not supported by pleaded facts and is alleged only in a broad and conclusory fashion. This, too, is insufficient to sustain Plaintiff's claim under Rule 12(b)(6). *See, e.g.*, *Danielson v. Veritext Corp. Servs.*, 2016 NCBC LEXIS 83, at *14 (N.C. Super. Ct. Oct. 28, 2016) (dismissing Chapter 75 claim where "[t]here [were] simply no allegations of fact that support[ed] the legal conclusion that [defendant] inequitably leverage[d] its position and power in an unfair, deceptive, oppressive, and substantially injurious manner" (quotation marks omitted)).

96. The only allegations against Scopia or CBC for unfair or deceptive trade practices supported by adequately pleaded facts relate to the Plan. The Complaint alleges an identifiable trade secret that Scopia and CBC allegedly misappropriated to preclude Aym from acquiring three specific companies and to enable CBC to acquire these companies instead. (Compl. ¶¶ 21–23.)

97. Our courts have long recognized that the misappropriation of a trade secret in violation of Chapter 66 is conduct that can constitute an unfair method of competition under Chapter 75. *See, e.g., Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172, 423 S.E.2d 324, 326 (1992) ("If the violation of the Trade Secrets Protection Act satisfies th[e] three prong test, it would be a violation of N.C. Gen. Stat. § 75-1.1."). Although, as the parties point out, our Court of Appeals held in *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 670 S.E.2d 321 (2009), that "a violation of the Trade Secrets Protection Act *constitutes* an unfair act or practice under N.C. Gen. Stat. § 75-1.1," *id.* at 659, 670 S.E.2d at 329 (emphasis added), the Court of Appeals later held in *Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 752 S.E.2d 634 (2013), consistent with *Drouillard*, that a TSPA violation constitutes a violation of section 75-1.1 only if it satisfies the three prong test, *Ge Betz, Inc.* 231 N.C. App. at 236, 752 S.E.2d at 650–51; *see also generally Legacy Data Access, LLC v. Mediquant, Inc.*, No. 3:15-cv-00584-FDW-DSC, 2017 U.S. Dist. LEXIS 198817, at *54–55 (W.D.N.C. Dec. 4, 2017). The Court concludes that *Ge Betz* and *Drouillard* supply the rule for decision in this case.

98. Turning then to the allegations here, the Court concludes, for purposes of the 12(b)(6) Motions, that CBC's and Scopia's alleged misappropriation of the Plan constitutes an unfair method of competition, was in or affecting commerce, *see* N.C. Gen. Stat. § 75-1.1(b), and, viewing its allegations in the light most favorable to Plaintiff, proximately caused actual injury to Aym. *See Ge Betz, Inc.*, 231 N.C. App. at 236, 752 S.E.2d at 650–51 (affirming 75-1.1 violation where the defendants "knew of the trade secrets at issue, had specific opportunities to disclose and use the trade secrets, did use and disclose the trade secrets, which disclosure and use was without the express or implied consent or authority of [plaintiff] and that . . . defendants [were] unjustly enriched as a result of the misappropriation of the trade secrets"). Thus, the Court concludes that Plaintiff's Chapter 75 claim should survive 12(b)(6) dismissal to the extent the claim is based on Scopia's and CBC's alleged misappropriation and use of Plaintiff's Plan but should otherwise be dismissed.[9]

### 4. Tortious Interference with Prospective Economic Advantage

99. The 12(b)(6) Movants next argue that Plaintiff's claim for tortious interference with prospective economic advantage is fatally deficient because Plaintiff fails to allege that, but for the 12(b)(6) Movants' actions, Plaintiff would have acquired HCM, Lindley, and/or Hughes. Instead, the 12(b)(6) Movants note, the

---

[9] As with Plaintiff's claim for misappropriation of trade secrets, in light of evidence advanced on the Rule 12(b)(2) Motions, the Court is skeptical that Plaintiff's Plan-based claim under section 75-1.1 will ultimately prove viable. However, the Court cannot, and does not, consider that evidence in deciding the 12(b)(6) Motions. *See, e.g.*, *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862.

Complaint merely alleges that Plaintiff "would have had a *higher probability* of securing [these] purchases." (Compl. ¶ 49 (emphasis added).)

100. The Supreme Court of North Carolina has recently reaffirmed that a fundamental element of a claim for tortious interference with prospective economic advantage is that "a contract would have resulted but for defendant's malicious intervention." *Beverage Sys. of the Carolinas, LLC v. Assocs. Bev. Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (dismissing claim under Rule 56 because "plaintiff ha[d] not demonstrated that any contract would have ensued but for defendants' conduct"); *see, e.g.*, *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982) (affirming view that plaintiff must show that contract would have ensued but for defendant's interference).

101. Plaintiff's failure to plead "but for" causation, therefore, is fatal to its claim. *See, e.g.*, *Dalton*, 353 N.C. at 655, 548 S.E.2d at 710 (finding necessary the element that, but for the alleged interference, "a contract would have ensued"); *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *29 (dismissing claim for tortious interference with prospective economic advantage on Rule 12(b)(6) where plaintiff alleged only that plaintiff "*reasonably expected* that, but for [d]efendants' conduct, its business relationships with its customers would have continued and grown." (emphasis added)). Thus, the Court concludes that Plaintiff's claim for tortious interference with prospective economic advantage against the 12(b)(6) Movants should be dismissed.

5. Breach of Contract

102. Plaintiff asserts a breach of contract claim against Rodgers for his alleged violation of the non-disclosure provision in the Independent Contractor Agreement. Rodgers contends that this claim necessarily fails under Rule 8's notice pleading requirements because Plaintiff has not alleged with particularity the specific trade secrets and confidential information Rodgers allegedly disclosed.

103. To allege a breach of contract claim under North Carolina law, a party need only plead the "(1) existence of a valid contract and (2) breach of the terms of that contract." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015) (quoting *Branch v. High Rock Lake Realty, Inc.*, 151 N.C. App. 244, 250, 565 S.E.2d 248, 252 (2002)). Unlike claims subject to Rule 9, a claim for breach of contract is not subject to heightened pleading standards, and instead, a plaintiff's complaint must merely "give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]" N.C. R. Civ. P. 8(a).

104. Here, Plaintiff alleges that (i) on or about April 1, 2009, Rodgers and the Plaintiff entered into the Agreement, (Compl. ¶ 10), (ii) the Agreement required Rodgers to keep confidential all of Plaintiff's "confidential information[,]" (Compl. ¶ 11), and (iii) Rodgers "breached his duty to Aym under the Independent Contractor Agreement by disclosing Aym's trade secrets and other confidential information to Scopia and Scopia HCM," (Compl. ¶ 28). These allegations satisfy both Rule 8 and

Rule 12(b)(6). Therefore, Rodgers's motion to dismiss Plaintiff's breach of contract claim at this stage of the litigation must be denied.

V.

CONCLUSION

105. **WHEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' Motions as follows:

   a. The Court **DENIES** Scopia's Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2) and Scopia's Motion to Dismiss for Inadequate Service of Process under Rule 12(b)(5);

   b. The Court **GRANTS** Scopia HCM's Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2) and Scopia HCM's Motion to Dismiss for Inadequate Service of Process under Rule 12(b)(5) and hereby **DISMISSES** Plaintiff's claims against Scopia HCM without prejudice;

   c. The Court **DENIES** the 12(b)(6) Movants' Motions to Dismiss Plaintiff's claim for misappropriation of trade secrets to the extent that claim is based on the misappropriation of the Plan but otherwise **GRANTS** 12(b)(6) Movants' Motions to Dismiss Plaintiff's claim for misappropriation of trade secrets and hereby **DISMISSES** that claim to this extent as to Scopia, CBC, and Rodgers with prejudice.

d. The Court **GRANTS** the 12(b)(6) Movants' Motions to Dismiss Plaintiff's conversion claim and hereby **DISMISSES** that claim as to Scopia, CBC, and Rodgers with prejudice.

e. The Court **DENIES** Scopia's and CBC's Motion to Dismiss Plaintiff's claim under section 75-1.1 to the extent that claim arises from the misappropriation and use of the Plan but otherwise **GRANTS** Scopia's and CBC's Motion to Dismiss Plaintiff's claim under section 75-1.1 and hereby **DISMISSES** that claim to this extent as to Scopia and CBC with prejudice.

f. The Court **GRANTS** Rodgers's Motion to Dismiss Plaintiff's claim under section 75-1.1 and hereby **DISMISSES** that claim against Rodgers with prejudice.

g. The Court **GRANTS** the 12(b)(6) Movants' Motions to Dismiss Plaintiff's claim for tortious interference with prospective economic advantage and hereby **DISMISSES** that claim as to Scopia, CBC, and Rodgers with prejudice.

h. The Court **DENIES** Rodgers's Motion to Dismiss Plaintiff's breach of contract claim against Rodgers.

**SO ORDERED**, this the 9th day of February, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
  for Complex Business Cases